In re Ronald Eugene SANDERS, Deborah Hadaway Sanders, Debtors.

Christine A. MARCH, Trustee, Plaintiff,

v.

Deborah Hadaway SANDERS, Defendant.

Bankruptcy No. 88–50953–07.
Adv. No. 89–50011.

United States Bankruptcy Court,
W.D. Louisiana,
Lafayette–Opelousas Division.

Feb. 20, 1991.

---

Phil Breaux, Breaux & Hornstein, St. Gabriel, La., for plaintiff/trustee, Christine March.

Deborah Sanders, pro se.

## MEMORANDUM OPINION

W. DONALD BOE, Jr., Bankruptcy Judge.

In this action brought by the Trustee, the court denies Defendant a discharge under 11 U.S.C. § 727(a)(2)(A) and (B) based on transfers occurring more than one year prior to bankruptcy of property in which Defendant had a concealed equitable interest until well after her bankruptcy filing of September 20, 1988. Discharge is also denied under 11 U.S.C. § 727(a)(4) based upon false oath and account.

There is a common misconception that transfers or other transactions made by a debtor more than one year before the filing of a petition are immunized from review of the bankruptcy court. A major reason for this misconception is that 11 U.S.C. § 727(a)(2)(A) provides for denial of discharge where a debtor has transferred property within one year before the date of filing with intent to hinder, delay, or defraud a creditor or an officer of the estate. What is often overlooked is that this same provision also refers to concealments of property of the debtor. Concealments may be continuing ones. Under some circumstances, a transfer made years before the bankruptcy petition is filed may involve a concealment that continues into the one year period. However, not all concealments will justify denial of discharge. A debtor must intend to hinder, or delay, or defraud at least one creditor or an officer of the estate, and this intention must be an actual one rather than merely constructive. In determining actual intent, the court must usually rely on circumstantial evidence such as a gratuitous transfer, a transfer to relatives, retention of beneficial or equitable ownership in the property transferred, transactions occurring after financial difficulties ensue or creditors threaten suit, and the totality of the circumstances. All these badges of intent to hinder, delay, or defraud exist in the present case and justify a denial of discharge under Sec. 727(a)(2)(A) and (B).[1]

Defendant in this proceeding is Deborah Hadaway Sanders. Her husband, Ronald Eugene Sanders, was originally a defendant. But before trial he waived a discharge under 11 U.S.C. § 727(a)(10). Following this waiver of discharge and the Trustee's success in state court in recovering property in a Louisiana revocatory action (the Louisiana equivalent of a fraudulent conveyances action), the court granted a dismissal as to Ronald Sanders as well as various corporate entities under his control from whom the Trustee had been attempt-

---

1. These provisions read:
 **Sec. 727. Discharge.**
 (a) The court shall grant the debtor a discharge, unless

 . . . . .

 (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
 (A) property of the debtor, within one year before the date of the filing of the petition; or
 (B) property of the estate, after the date of the filing of the petition.

ing to recover property under Secs. 548 and 550 of the Bankruptcy Code.

Mr. and Mrs. Sanders were represented by experienced bankruptcy counsel when Mr. Sanders' waiver of discharge was approved by the bankruptcy court. Mrs. Sanders later fired that attorney based upon "philosophical differences". Still later, Mrs. Sanders wanted Mr. Sanders to represent her. The court held that Mr. Sanders could not. Mr. Sanders was not a member of the bar. Even had he been a licensed attorney, there would be potential for inadequate representation. Attorneys representing defendants like Mrs. Sanders in Sec. 727 denial of discharge cases, as well as in Sec. 523(a) exception to discharge cases, can sometimes exculpate their clients by blaming their clients' spouses. Only an exceptional person could effectively represent his wife under these circumstances. Despite repeated oral warnings by the court that Mrs. Sanders should avail herself of licensed counsel, she chose to represent herself in proper person (pro se) at the trial.

■ In the present case, there is clear and convincing evidence that Mrs. Sanders should be denied a discharge under Sec. 727(a)(2) because she actively participated in a scheme intended to hinder and to delay and to defraud creditors and, while not required for denial of discharge, did in fact hinder and delay and defraud them. There is also clear and convincing evidence (meeting a higher standard of proof than is required) justifying denial of discharge under Sec. 727(a)(4) because of false oath and account.[2]

In October 1986 Mr. and Mrs. Sanders as settlors established Golden Phoenix Inter Vivos Trust No. 1 and No. 2 with their minor daughters as beneficiaries. Other trusts, Amdulaine Trust No. 1 and 2, had been previously set up for the children (Transcript 120–121). The Amdulaine Trusts had different trust property than the Golden Phoenix Trusts. (Transcript 277). The property placed into the Golden Phoenix Trusts by Mr. and Mrs. Sanders included artwork, antiques, a DeLorean automobile, and 1,000 shares of stock in Ascension Development Properties, Inc. These properties were then transferred by the Golden Phoenix Trusts in early 1987 to Golden Phoenix Holding Company (Holding), a corporation Mr. and Mrs. Sanders had created. The Golden Phoenix Trusts received Holding stock in exchange for this transfer. The valuations placed on the properties transferred from the Golden Phoenix Trusts to Holding are set forth in the January 19, 1987 balance sheet of Holding:

---

**2.** The court in the case at bar is applying a clear and convincing evidence standard to the Sec. 727(a)(2) cause of action but a preponderance of the evidence standard to the Sec. 727(a)(4) cause of action. The Supreme Court has not addressed the issue of the standard of proof in Sec. 727(a)(2) cases. *Grogan v. Garner,* —— U.S. ——, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) holds that the appropriate standard of proof in all exception to discharge cases brought under Sec. 523(a) of the Bankruptcy Code is preponderance of the evidence, not clear and convincing evidence. It states that Congress chose the preponderance standard to govern determinations under 11 U.S.C. 727(a)(4), the Trustee's alternative basis for denial of discharge in this case. *Id.* The legislative history on which *Grogan* relies discloses that Sec. 727(a)(2), (a)(3), and (a)(4) are derived from Bankruptcy Act Sec. 14 c. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 384–385 (1977); U.S.Code Cong. & Admin.News 1978, pp. 5963, 6340, 6341, H.R.Rep. No. 95–989, 95th Cong., 2nd Sess. 98–99 (1978); U.S.Code

Cong. & Admin.News 1978, pp. 5787, 5884, 5885. Bankruptcy Act Sec. 14 c made commission of a bankruptcy crime under 18 U.S.C. § 152 a basis for a denial of discharge. But 18 U.S.C. § 152 makes *all* of the actions specified in Sec. 727(a)(2), (a)(3), and (a)(4) sanctionable by fine or imprisonment if proved beyond a reasonable doubt in a criminal trial. Thus, when the House and Senate reports refer to Sec. 727(a)(4) stating that "The fourth ground for denial of discharge is the commission of a bankruptcy crime, though the standard of proof is preponderance of the evidence rather than proof beyond a reasonable doubt", it may seem reasonable to apply the preponderance standard to all denial of discharge actions brought under Secs. 727(a)(2), 727(a)(3), and 727(a)(4). But this interpretation may involve an excessively literalist reading of the report language just quoted. Is it not possible that all the report drafter was attempting to highlight was that the criminal standard of proof beyond a reasonable doubt would not apply?

| | |
|---|---|
| 1. art collection | $68,075.00 [3] |
| 2. antiques | $34,000.00 |
| 3. automobiles (DeLorean) | $11,000.00 |
| 4. gun collection | $10,850.00 |
| 5. stock (Ascension Development Properties Inc.) | $ 7,000.00 |

None of these assets produced income; the only way they could generate any money was by sale. (Exhibit A–1, Transcript 112, 114). Some of these assets were sold to pay living expenses of the Sanders family in 1987, 1988, and 1989.

Physical possession of the assets, even after the transfer to Holding, was retained by Mr. and Mrs. Sanders. By the Spring of 1987, a number of money judgments were being obtained against one or both of them. These judgments amounted to at least $525,000.00, plus interest and costs. The timing of these judgments shows that the Sanders' financial troubles did not begin in late 1986 as Mrs. Sanders contended at trial, but rather were a culmination of earlier events and defaults. Their schedules in the bankruptcy case showed $3.7 million in unsecured indebtedness.

■ Mr. and Mrs. Sanders' Statement of Financial Affairs shows they were involved in a number of lawsuits commenced in 1985 and 1986. Interestingly enough, these lawsuits of 1985 and 1986 coincide with the period in which the Sanders claim to have earlier donated to their children property that was later transferred to the Golden Phoenix Trusts. Mrs. Sanders on post-trial brief takes the position that because these earlier donations transferred title to the children, there was no "property of the debtor" that could have been transferred or concealed in late 1986 within the meaning of Sec. 727(a)(2). There is little support in the formal record of this proceeding to support the assertion regarding earlier transfers.[4] The earlier established Amdulaine Trusts had different trust property than the Golden Phoenix Trusts. Even if the court believed the testimony of Mr. Sanders that the property was donated to the children in 1985 or 1986 prior to the establishment of the Golden Phoenix Trusts, the clear inference to be drawn would be simply that the purpose of Mr. and Mrs. Sanders in parting with with legal title at an earlier date coinciding with the onset of lawsuits was to insulate property they continued to use and enjoy from their creditors. It makes no difference whether the prohibited concealment involves one step or thirty when there is an actual intent to hinder, or delay, or defraud a creditor or an officer of the estate.

■ Based upon the evidence of record, the property that Mr. and Mrs. Sanders gratuitously transferred more than one year prior to bankruptcy was concealed with intent to hinder, delay, and defraud creditors. *Matter of Chastant*, 873 F.2d 89, 91, 19 B.C.D. 850, 851, Bankr.L.Rep. p. 72,929 (5th Cir.1989), a case decided on this circuit involving transfer within the one year period, uses the following factors as evidence of intent to defraud:

(1) the lack or inadequacy of consideration;

(2) the family, friendship, or close associate relationship between the parties;

(3) the retention of possession, benefit, or use of the property in question;

(4) the financial condition of the defendant before and after the transaction in question;

---

3. The art, the antiques, and the guns recovered in the state revocatory action in the 18th Judicial District Court brought approximately $62,000.00 at public bankruptcy auction held in the Spring of 1990. The state court also ordered delivery to the trustee of the one percent commission payments from Gulf Island I, II, III, IV, and V that had been made to Financial Services; the 33⅓% "back-end" interest in Gulf Island I, II, IV, and V; the interest of Mr. and Mrs. Sanders in Prospective Group 1981–III Limited Partnership; and the interest of Louisiana Resources in Prospective Group 1980–1981 Limited Partnership. (January 4, 1990 Judgment, Exhibit F–1). These assets had never been listed in the bankruptcy schedules signed under penalty of perjury.

4. In combing the bankruptcy case file for leads on this issue, the court has discovered a copy of a document filed in the 18th Judicial District Court by Holding which asserts that Mr. and Mrs. Sanders originally transferred the DeLorean and 18 firearms to their minor children by Acts of Donation dated December 31, 1985, and January 7, 1986.

(5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suit by creditors; and

(6) the general chronology of the events and transactions under inquiry.

The factors cited in *Chastant* establish the fraudulent intent required for a denial of discharge in this case. Mr. and Mrs. Sanders for no consideration nominally donated valuable property to their children's trusts but retained possession or use of this property at a time when they were faced with a number of lawsuits later reduced to judgment. The cumulative effect of their transactions was to leave virtually no uncumbered assets in their names and, though not required for a denial of discharge, resulted in hindering, delaying, and defrauding creditors and the Trustee. Substantial litigation costs were imposed on the bankruptcy estate which was obliged to pursue a state revocatory action which culminated, but only in 1990, in the return to the Trustee of some of the Sanders' property, with the remainder either "cashed in" by the Sanders or simply unaccounted for.

■ The gratuitous transfers to the children's trusts create a presumption that Mrs. Sanders who engaged in them intended to defraud and shift to her the burden of demonstrating that she lacked fraudulent intent. *Chastant*, 873 F.2d at 90–91; *In re Butler*, 38 B.R. 884, 888 (Bankr.D.Kan. 1984); *Matter of Loeber*, 12 B.R. 669, 4 C.B.C.2d 448 (Bankr.D.N.J.1981). The attempts of Mr. and Mrs. Sanders at trial to demonstrate that Mrs. Sanders had no fraudulent intent lacks support in both a common sense analysis of the facts as well as an examination of the case law.

Mrs. Sanders testified that the trusts were set up to pay for medical expenses of the children. (Transcript 104–105). But the Golden Phoenix Trusts were not used to pay medical expenses; the doctor and the hospital were listed as (unpaid) unsecured creditors in the bankruptcy schedules filed by Mr. and Mrs. Sanders. (Transcript 121–122). Furthermore, other trusts having other assets had earlier been set up for the children. (Transcript 120–121). Mr. Sanders testified that the Golden Phoenix Trusts were set up for legitimate estate planning purposes by astute legal minds. This testimony is unsubstantiated by any lawyer's testimony. Mr. Sanders would have the court merely assume that an attorney was consulted. He would further have the court assume that such consultation was sought by Mr. and Mrs. Sanders with full disclosure and in good faith rather than to shield forbidden transactions in the cloak of "My lawyer told me so."

■ The 5th Circuit's discharge-denying decision in *Chastant, supra,* involved property transferred less than one year prior to bankruptcy. In the instant case, the property was transferred more than one year prior to bankruptcy, but the transferors retained beneficial interests in that property which continued into the year prior to bankruptcy (in fact, continued even after the bankruptcy petition was filed). As a matter of law on this circuit, transfer of title to property while retaining benefits of ownership constitutes concealment within the purview of Sec. 727(a)(2). *In re Olivier*, 819 F.2d 550, 555, 16 C.B.C.2d 1330, 1336, Bankr.L.Rep. p. 71,867 (5th Cir. 1987) recognizes that the doctrine of continuing concealment will be applied in appropriate cases. The court in *Olivier* held that a gratuitous transfer of title to a house seven years before the bankruptcy filing to shield this asset from an unfavorable result in anticipated personal injury litigation was within the reach of Sec. 727(a)(2)(A) when the debtors retained a secret, significant beneficial interest by continuing to occupy the house as their own.

■ Under the continuing concealment doctrine, discharge is denied when property is transferred more than one year prior to bankruptcy but with a secretly retained interest in it. *See In re Kaiser*, 722 F.2d 1574, 9 C.B.C.2d 910, 11 B.C.D. 529, Bankr. L.Rep. p. 69,511 (2nd Cir.1983) (denial of discharge affirmed when insolvent debtor transferred houses to wife without consideration several years prior to bankruptcy);

*In re Martin,* 698 F.2d 883, 887, 8 C.B.C.2d 152, 155, 10 B.C.D. 212, 215, Bankr.L.Rep. p. 69,083 (7th Cir.1983) (discharge order reversed and remanded when debtor's use of condominium after transfer of title could be continuing concealment); *Matter of Kauffman,* 675 F.2d 127 (7th Cir.1981) (transfer of title to house with continued use thereafter was continuing concealment into the statutory period even though the conveyance was recorded); *Green v. Toy,* 171 F.2d 979 (1st Cir.1949) (transfer without consideration more than one year before bankruptcy to a "dummy corporation" was continuing concealment precluding discharge); *In re Walter,* 67 F.Supp. 925 (S.D.N.Y.1946) (retention of beneficial interest in home was continuing concealment); *In re Essres,* 122 B.R. 422 (Bankr. D.Colo.1990) (transfers more than one year prior to bankruptcy for less than fair consideration to grown children living in debtor's household prevented discharge under Sec. 727(a)(2)(A)); *In re Peters,* 106 B.R. 1 (Bankr.D.Mass.1989) (undocumented sale of Corvette to close associate was a sham and continuing concealment); *In re Syrtveit,* 105 B.R. 596, 599 (Bankr.D.Mont.1989) (continued enjoyment of property transferred to relatives without consideration was continuing concealment); *In re Penner,* 107 B.R. 171, 175 (Bankr.N.D.Ind.1989) (continuing concealment of equitable interest in dairy that produced income to pay debtor's business and personal expenses); *In re Hodge,* 92 B.R. 919, Bank.L.Rep. p. 72,528 (Bankr.D.Kan.1988) (assets transferred without consideration six years prepetition and two years prepetition to corporations debtor controlled and by which his wife earned income warranted Sec. 727(a)(2)(A) denial of discharge); *In re McNamara,* 89 B.R. 648 (Bankr.N.D.Ohio 1988) (discharge denied because of sham transfers of real estate and money to relatives without consideration); *In re Howard,* 55 B.R. 580 (Bankr.E.D.N.C.1985) (transfer of house and antiques was sham resulting in continuing concealment well into the year prior to debtor's bankruptcy petition when debtor lived in the house furnished with the antiques). *But cf., In re Serafini,* 113 B.R. 692, 694–695 (D.Colo. 1990) (insufficient evidence of debtor's use of assets conveyed into trust more than one year prior to bankruptcy); *In re Hooper,* 39 B.R. 324, 327 (Bankr.N.D.Ohio 1984) (bare proof that debtor continued to live in house transferred to grown son without any other evidence of retention of beneficial interest did not bring transfer within the statutory one-year period); *In re Herron,* 49 B.R. 32 (Bankr.W.D.Ky.1985) (continuing concealment doctrine did not dictate *revocation* of discharge under Sec. 727(d) where land, farming equipment, and growing crops were transferred to relatives for purported consideration by recorded conveyance of which plaintiff had actual knowledge in advance of discharge).

■■■ Mrs. Sanders maintains that there could not have been concealment because the trust documents were recorded and therefore public knowledge. This misses the point. The debtors' continued use and enjoyment of property after it was transferred was not recorded and constituted a continuing concealment. *See Matter of Kauffman, supra.* Mrs. Sanders also argues that there could not have been a concealment because the bankruptcy schedules she and her husband filed disclosed that the contents of the house in which they were living were owned by the children. The Debtors' Statement of Financial Affairs, answer 6, in response to the question "What property do you hold for any other person?", stated "The contents of the home along with the house in which we are living are owned by the children's trust (corporation)." The court views this answer as an attempt to shield assets from the Trustee's liquidation, not an attempt to disclose them. Particularly in view of numerous other failures to disclose discussed in this opinion, the court cannot conclude that this was an honest answer or that the debtors engaged in an honest attempt to provide creditors with usable information regarding their financial affairs.[5]

---

5. In a questionnaire later used by the trustee at the Sec. 341 meeting of creditors and signed by

Mr. and Mrs. Sanders under oath, they disclosed that the contents of the home in which they

■ But more to the point, even adequate disclosure in the Statement of Financial Affairs and the Schedules in this case would not have cured the pre-bankruptcy efforts actually intended to hinder, delay, and defraud creditors. Disclosure of information can protect against denial of discharge for a false oath or account. But rarely could disclosure protect against denial of discharge based on Sec. 727(a)(2) transfers or concealments made with intent to hinder, delay, or defraud. Those who seek discharge in bankruptcy must make honest disclosure, but sometimes disclosure will reveal that the debtor in other respects does not qualify for a fresh start. This debtors dilemma results from the multiple grounds for denial of discharge which include transfers or concealments with intent to hinder, delay, or defraud (Sec. 727(a)(2)), destruction or failure to keep records (Sec. 727(a)(3)), knowing and fraudulent false oaths and accounts (Sec. 727(a)(4)), and refusal to testify after grant of immunity. (Sec. 727(a)(5)).

■ Court of Appeals decisions that have considered this dilemma have taken the position that mere disclosure of actions prohibited by Sec. 727(a)(2)(A) will not prevent denial of discharge. What may allow discharge is disclosure accompanied by voluntary prepetition reversal of the prohibited activities before harm to creditors has occurred.

In a case recently decided by the 11th Circuit, fraudulent transfers of the marital home were disclosed by the debtors. The assets were reconveyed the day before the bankruptcy petition was filed, with the result that assets in the bankruptcy estate were not diminished. The court nonetheless held that Sec. 727(a)(2)(A) should be read literally and that discharge should be denied. Earlier, pre-bankruptcy harm to creditors may have contributed to this result:

> "We point out that in cases such as this one, the creditor is harmed whether or not any equity exists in the property transferred that may come into the estate. The creditor presumably incurred legal fees and expenses when he brought an action challenging the fraudulent transfer."

*In re Davis*, 911 F.2d 560, 562, 20 B.C.D. 1532, 1534, Bankr.L.Rep. p. 73,609 (11th Cir.1990). Under the 9th Circuit's decision *In re Adeeb*, 787 F.2d 1339, 1345, 14 C.B.C.2d 740, 14 B.C.D. 715, Bankr.L.Rep. p. 71,108 (9th Cir.1986), subsequent disclosure would not undo an unlawful transfer, but disclosure plus prepetition voluntary reversal of the transfer would. The case was remanded for a trial court determination of the extent of the prepetition reversal. The 7th Circuit in *Matter of Smiley*, 864 F.2d 562, 566, 18 B.C.D. 1229, 1233, Bankr.L.Rep. p. 72,637 (7th Cir.1989) found the *Adeeb* policy of promoting disclosure "not applicable ... where property was recovered only as a result of the action of the bankruptcy trustee and the court." In the instant case involving Mrs. Sanders, adequate disclosure of the debtors' assets and financial affairs was not made; voluntary prepetition reversal of their transactions did not occur; some concealed assets were liquidated by the debtors and irretrievably lost to creditors; and both a creditor and the bankruptcy estate had to incur considerable expense in recovering property in the state revocatory action. Mrs. Sanders cannot receive a discharge.

Mrs. Sanders had a direct hand in the scheme that first transferred assets to the Golden Phoenix Trusts and then to Holding in an asset-for-stock exchange.[6] She was a

---

were living belonged to Golden Phoenix Holding Company. A number of creditors attended that meeting and soon thereafter a Rule 2004 examination was taken of the debtors. The debtors after a lapse of several months subsequently amended their Statement of Financial Affairs and their Schedules, but even then they failed to provide honest disclosure.

**6.** The assets transferred by the Golden Phoenix Trusts constituted Holding's only initial assets.

(Exhibit C–9). Holding apparently did acquire other assets, but only with borrowed funds. While there were various transfers of money from Holding's subsidiaries to Holding, it is not clear whether money derived from sale of Golden Phoenix assets was just being moved back and forth in a circulatory system of alter ego corporations or whether some of these corporations were able to generate income independently of asset sales. Substantial "consulting fees"

director and Secretary/Treasurer of Holding (Exhibit C–1), kept the minutes of its meetings (Exhibits C–4 and C–5), had signature authority to write checks on its account (Exhibit C–2), and utilized this authority to write most of its checks (Exhibit C–10, Transcript 79), (Exhibits C–4 and C–5). She paid substantial "consulting fees" to Mr. Sanders. Mrs. Sanders also drew checks in favor of a private school one or both of her daughters attended. She also wrote checks for various family debts (Transcript 94–96). Holding in December 1987 sold trust assets to make a down payment on a home in Washington, Louisiana in which Mr. and Mrs. Sanders lived and in which many of the antiques and other assets transferred to Holding were placed. (Transcript 84–85, Exhibit C–12). *See, In re Howard, supra* (continued use of house and antiques called for denial of discharge). Holding also purchased a used Lincoln used by Mr. and Mrs. Sanders. (Exhibit C–13). The court must reject the portrait Mrs. Sanders paints of herself as a housewife largely ignorant of financial affairs and totally ignorant of the significance of her actions and those of her husband. Mrs. Sanders cooperated extensively with Mr. Sanders in patterns of activity designed to hinder, delay, and defraud creditors by intentional concealment extending right up to the date of bankruptcy filing and even beyond in violation of Sec. 727(a)(2)(A) and (B) respectively.

The Trustee also seeks denial of discharge based upon Sec. 727(a)(4)(A) for knowing and fraudulent making of false oath or account in or in connection with the bankruptcy case. In the case at bar, Mrs. Sanders signed a Voluntary Petition, Schedules of Assets and Liabilities, and a Statement of Financial Affairs, all containing the usual unsworn declarations under penalty of perjury. *See* Official Bankruptcy Forms Nos. 1, 6, and 8. These written declarations under penalty of perjury have the force and effect of oaths. 28 U.S.C. § 1746; *Nissho–Iwai American Corp. v. Kline,* 845 F.2d 1300, 1306–1307 (5th Cir. 1988).

The statement under oath must be known by its maker to be false and be made willfully (rather than inadvertently) with an intent to defraud. This intent may be established by circumstantial evidence. Omission of property or income from a debtor's schedules may be both false oath under Sec. 727(a)(4) and forbidden concealment under Sec. 727(a)(2). 4 *Collier on Bankruptcy* par. 727.04 at 727–63 (15th ed. 1990); *Calder v. Calder,* 907 F.2d 953, 23 C.B.C.2d 677, Bankr.L.Rep. p. 73,507 (10th Cir.1990). Statements made with reckless indifference to the truth are regarded as intentionally false. *In re Tully,* 818 F.2d 106 (1st Cir.1987). The statement under oath, however, must be related to a material matter, that is, to the debtor's business transactions or estate, or discovery of assets or business dealings, or the existence or disposition of the debtor's property. *Williamson v. Fireman's Fund Insurance Co.,* 828 F.2d 249, Bankr.L.Rep. p. 71,991 (4th Cir.1987); *In re Chalik,* 748 F.2d 616, 11 C.B.C.2d 1159, 12 B.C.D. 855, Bankr. L.Rep. p. 70,164 (11th Cir.1984).

The record in this proceeding shows a pronounced disposition not to

---

were paid to Mr. Sanders, though there are no records of invoices or hours charged for consulting. The records of his consulting work were allegedly lost when the Sanders moved out of their home after bankruptcy and left records there. (Transcript 318). There is testimony that Mr. Sanders was not home at the time of the move and that Mrs. Sanders forgot his business records because she had only three weeks to pack. (Transcript 351). This forgetfulness and inattention is most difficult to believe since Mrs. Sanders, who has two years of college, was heavily involved in his financial affairs, and since Mr. Sanders, a financial consultant, is frequently concerned with tax matters if one is

to believe his testimony. Answer 5d of the Sanders' Statement of Financial Affairs in responding to the question whether any books of account or records have been lost within two years before the filing of the petition states that some records were stored at the home of Mr. Sanders' grandmother and destroyed when a tornado hit in 1987. While these disappearances of records seem strange, the trustee has not asserted that discharge should be denied under Sec. 727(a)(3) for concealment or failure to preserve books and records from which the debtors' financial condition might be ascertained.

make meaningful and honest disclosure of assets and business transactions. Generally speaking, this occurred by omission of required information; at other times, through bare hint of disclosure.

"Sworn statements filed in any court must be regarded as serious business. In bankruptcy administration, the system will collapse if debtors are not forthcoming. The record in this case shows, at the very least, cavalier indifference and disdain for the truth. Meaningful disclosure was accorded much too low a priority. The law, fairly read, does not countenance a petitioner's decision to play a recalcitrant game, one where the debtor hides and the trustee is forced to go seek."

*In re Tully,* 818 F.2d at 112.

In the present case, the initial Schedules of Assets and Liabilities and the Statement of Financial Affairs were not abbreviated, slap dash affairs put together in haste. They were lengthy and had considerable detail. Yet, virtually nothing was disclosed about the Golden Phoenix Trusts or the assets poured into them. Nothing at all was disclosed about Holding. Nothing was disclosed about Golden Phoenix Financial Services which essentially performed the treasury function for Holding through an undisclosed bank account. Nothing was disclosed about Holding's other subsidiaries. And significant assets unrelated to the Golden Phoenix Trusts or Holding were undisclosed. Some information regarding these matters came to light at the Sec. 341 meeting of creditors, and some more after a Rule 2004 examination. Even after that examination, Mr. and Mrs. Sanders waited a considerable period of time to file amendments to the Schedules of Assets and Liabilities and the Statement of Financial Affairs. As amended, those documents still did not provide meaningful disclosure.

 The record in this case shows false oath in the original and amended Schedules and Statement of Financial Affairs in the following respects:

1. The assertion in the Statement of Affairs that the house in which the Sanders were living and its contents were owned by the children's trust, when in fact they were held primarily for the benefit of Mr. and Mrs. Sanders.

2. The related assertion in Schedule B–1 that the value of real property in which the debtors had an interest (including equitable) was "None".

3. The related assertion in Schedule B–2, Personal Property, that the value of debtors' equitable interests and rights or powers exercisable for their benefit was "$0.00".

4. The related failure to list in Schedule B–2, Personal Property:

(a) any antiques or household furniture; [7]

(b) any art collection or art;

(c) two automobiles (Lincoln and DeLorean);

(d) any gun collection or guns, except one pistol; and

(e) the stock in Ascension Development Properties, Inc.[8]

5. The failure to make any reference in the Schedules or Statement of Financial Affairs to:

(a) Holding; and

(b) The subsidiaries of Holding which included:

(i) Airforce Corporation

(ii) A.R.S., Inc.

(iii) Control General, Inc.

(iv) Golden Phoenix Financial Services

(v) Golden Phoenix of Louisiana, Inc.

(vi) Houma Phoenix Industries, Inc. (80% interest)

(vii) K.E.S., Inc.

(viii) Phoenix Corporation of Louisiana; and

**7.** Amended Schedule B–2 disclosed only a two couch set and two recliners.

**8.** Amended Schedule B–2 appears to have disclosed this stock.

(ix) Phoenix Industrial Corporation of America [9]

6. The failure to list Account No. 01–0120–6 at Bunkie Bank and Trust Company in response to question 4a of the Statement of Financial Affairs regarding accounts maintained in the preceding two years "in your name or any other name". This account, which was opened under Mrs. Sanders social security number, and in the name of Golden Phoenix Financial Services, was used by Mrs. Sanders to pay personal and family expenses.[10]

These same documents also failed to list:

1. Commission payments received from Gulf Island I, II, III, IV, and V Limited Partnerships;

2. A 33⅓% "backend" interest in the Gulf Island I, II, IV, and V Limited Partnerships;

3. Interests in Prospective Group 1981–III Limited Partnership and Prospective Group 1980–1981 Limited Partnership; and

4. Stock in the Sanders Group (Transcript 326–326).

However, the record was not clearly developed as to these interests, and does not show that Mrs. Sanders was sufficiently aware of them to be capable of engaging in an intentional false statement with regard to them.

 The Trustee has also maintained that discharge should be denied under 11 U.S.C. § 727(a)(5) for failure to explain losses of assets or deficiency of assets satisfactorily. The Trustee has not proved by a preponderance of the evidence that discharge should be denied based upon this ground. The Trustee has the burden of proof under Bankruptcy Rule 4005 and the ultimate burden of persuasion. *Matter of Reed,* 700 F.2d 986, 992–993, 8 C.B.C.2d 370, 376–377, 10 B.C.D. 695, 698–699,

Bankr.L.Rep. p. 69,110 (5th Cir.1983). If the Trustee can establish a prima facie case regarding lost assets, the burden is then placed on the debtor to provide a satisfactory explanation of what happened to them. *In re Chalik,* 748 F.2d at 619 (11th Cir. 1984). However, simply alleging lack of adequate explanation for lost assets does not make a prima facie case. *In re Martin,* 698 F.2d 883, 886–887, 8 C.B.C.2d 152, 155–157, 10 B.C.D. 212, 214–216, Bankr. L.Rep. p. 69,083 (7th Cir.1983). In the case at bar, the Trustee has not by evidence sufficiently established which assets are "missing" to make a prima facie case. At least some of the assets with which the Trustee has been concerned were simply sold to pay living expenses.

The court today is signing a judgment denying Mrs. Sanders a discharge under Sec. 727(a)(2)(A) and (B) and Sec. 727(a)(4).

---

**9.** These organizations could not have been inadvertently omitted by Mrs. Sanders. She handled the checkbook of Golden Phoenix Financial Services which both received from and made payments to some of the Holding subsidiaries. Any argument that these organizations did not have to be listed because they were valueless would lack merit under *Chalik, supra,* which denied discharge for failure to list 12 valueless corporations in which the debtor had

an interest. The same argument would also lack factual basis since the Trustee regained substantial assets from Holding post-bankruptcy.

**10.** This account was closed out only one month prior to bankruptcy. The Sanders had another account (in their names) at the same bank.