**In re E.M. RADCLIFFE.**

**BOLD CITY VII, LTD., a Florida Limited Partnership; Harvey Stringer, General Partner; and A.F. Smith, Ed Danciger, and William B. Maloney, individually, and as Limited Partners, Plaintiffs,**

v.

**E.M. RADCLIFFE, Defendant.**

**Robert McKINLEY as Trustee for Island Landing Mortgage Investment Trust, Plaintiff,**

v.

**E.M. RADCLIFFE, Defendant.**

**Bankruptcy No. 90–30160M.**
**Adv. Nos. 90–3021S, 90–3026S.**

United States Bankruptcy Court,
E.D. Arkansas,
Jonesboro Division.

June 5, 1992.

Kimberly Tucker, Little Rock, Ark., for plaintiffs.

David Solomon, Helena, Ark., for defendant.

## MEMORANDUM OPINION

MARY D. SCOTT, Bankruptcy Judge.

On January 29 and 30, 1992, two adversary proceedings, consolidated for trial, were heard by the Court. Both of these adversary proceedings were initiated by complaints objecting to the debtor's discharge and to determine dischargeability of debts. Because the debtor's discharge in bankruptcy pursuant to Bankruptcy Code section 727 is denied herein, the Court does not reach the issues regarding dischargeability under section 523. No claims against Radcliffe in this chapter 7 case will be discharged.

## I. ALLEGATIONS OF THE PARTIES

On April 11, 1990, E.M. Radcliffe filed a voluntary chapter 7 petition in Bankruptcy. The schedules filed on that date included the Statement of All Property and Statement of Financial Affairs for Debtor Not engaged in Business. The plaintiffs are unsecured creditors of the debtor, the amount of whose claims are undisputed. The debts were incurred in connection with a project known as Island Landing located in St. Augustine, Florida, and owned by a joint venture between Radcliffe Investment Corporation of Florida and Bold City VII, Ltd.

During the 1980's, the debtor was engaged in numerous development and other real estate activities through his ownership in and involvement with a number of entities including Radcliffe Investment Company of Arkansas, Radcliffe Investment Company of Florida, and Delta Title Company. The debtor is an officer and director of Radcliffe Investment Corporation of Florida.

The plaintiff McKinley objects both to the discharge of the debtor and also seeks a determination that his claim is not dischargeable. The grounds asserted for denying discharge rest upon the debtor's transfer and concealment of property with the intent to hinder and defraud creditors, pursuant to 11 U.S.C. § 727(a)(2); the debtor's failure to keep or preserve records as required by 11 U.S.C. § 727(a)(3); the false oaths made by the debtor on his bankruptcy schedules pursuant to 11 U.S.C. § 727(a)(4); and the debtor's failure to explain the loss of assets as required by 11 U.S.C. § 727(a)(5). The grounds for the nondischargeability of McKinley's claim is based upon 11 U.S.C. § 523(a)(2), (4).

Plaintiff Stringer was the general partner of Bold City VII and personally guaranteed certain notes to the Florida National Bank and to Mr. Smith, Mr. Danciger, Mr. Maloney and Mr. McKinley. The allegations by the Bold City plaintiffs mirror those in the pleadings filed by McKinley.[1]

The underlying theme presented at trial by all plaintiffs was the debtor's relationship with Delta Title Company ("Delta") and to a lesser extent, the debtor's transactions with family and friends. The debtor is the president and sole-shareholder of Delta. Delta now owns many of the assets once owned by the debtor and it continues to pay all of the debtor's personal expenses. For all practical purposes, the debtor has attempted to maintain the benefit of personal assets and a comfortable, if

---

1. The complaint filed by the Bold City plaintiffs requests in its prayer for relief that the debt be reduced to judgment. That matter, however, is not properly before the Court. A request that a debt be reduced to judgment is a separate cause of action, not pleaded in the complaint. Moreover, such an action is not a core proceeding.

not luxurious, life-style, at the expense of his creditors. He has accomplished this by transferring and concealing assets within the shield of Delta and omitting or forgiving loans due him from Delta.

The debtor raises two legal arguments, but essentially relies upon the assertion that the plaintiffs have failed to meet their burdens of proof. First, the debtor argues that the plaintiff Bold City has no standing to object to the dischargeability of Bold City's debt inasmuch as it has not filed a proof of claim in the bankruptcy. Secondly, the debtor argues that section 523(a)(4) applies only with respect to express trusts. Inasmuch as the Court does not reach the issues raised by section 523, these issues will not be addressed in this opinion.[2]

## II. CONCLUSIONS OF LAW

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a), 1334. Moreover, this Court concludes that this is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(1) as exemplified by 28 U.S.C. § 157(b)(2)(I), (J).

The discharge in bankruptcy is the foremost remedy to effectuate the "fresh start" which is the goal of bankruptcy relief. *Ray v. Graham (In re Graham)*, 111 B.R. 801, 805 (Bankr.E.D.Ark.1990). Consequently, the Code provisions in any objection to discharge must be strictly construed. *Panuska v. Johnson (In re Johnson)*, 80 B.R. 953 (Bankr.D.Minn.1987), *aff'd*, 101 B.R. 997 (D.Minn.1988), *remanded for further proceedings*, 880 F.2d 78 (8th Cir.1989). The burden is upon the objecting party to prove all elements of the statute setting forth grounds for denying discharge. *Graham*, 111 B.R. at 805.

The policy in favor of a fresh start is balanced by the duty of disclosure. The duty of disclosure is a basic prerequisite to obtaining a discharge in bankruptcy. *Nassau Savings and Loan Association v. Trinsey (In re Trinsey)*, 114 B.R. 86, 91 (Bankr.E.D.Pa.1990). Creditors are entitled to know what happened to the debtor's assets which might have satisfied debts.

**2.** This Court addressed the argument that section 523(a)(4) applies only to express trusts in

The disappearance of assets, without documentation or sufficient explanation, upends the tendency to favor the fresh start.

Section 727(a), provides as follows:

The court shall grant the debtor a discharge, unless,

(2) the debtor, with the intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of petition; or

(B) property of the estate, after the date of the filing of the petition;

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;
* * *

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.   * * *

11 U.S.C. § 727(a)(2), (3), (4), (5).

### A. *Fraudulent Transfers:*
### *Section 727(a)(2)*

The Court finds that the plaintiffs have sustained their burden with regard to section 727(a)(2) and specifically with respect to the element of intent. In order to meet their burden under section 727(a)(2)(A), plaintiffs must show:

(1) a transfer of property occurred;

*Bell v. Collins (In re Collins)*, 137 B.R. 754, 756 (Bankr.E.D.Ark.1992).

(2) the property was property of the debtor;

(3) the transfer occurred within one year of the filing of the petition; and

(4) the debtor had, at the time of the transfer, intent to hinder, delay or defraud a creditor.

*In re Hodge*, 92 B.R. 919 (Bankr.D.Kan. 1988).

■ Section 727(a)(2) contains the element of intent to deceive and involves a two-part inquiry. First, the debtor's actual intent must be found as a matter of fact from the evidence presented. *Graham*, 111 B.R. at 805. Of course, the objecting party must generally rely on a combination of circumstances which suggest that the debtor harbored the necessary intent. The Court may then draw an inference from this evidence. *In re Van Horne*, 823 F.2d 1285, 1287 (8th Cir.1987); *Owens v. United States*, 98 F.Supp. 621 (W.D.Ark.1951), *aff'd*, 197 F.2d 450 (8th Cir.1952). Fraud may be established by circumstantial evidence because direct proof of the debtor's intent is rarely available. "Once the creditor introduces circumstantial evidence proving the debtor's intent to deceive, the debtor 'cannot overcome [that] inference with an unsupported assertion of honest intent.'" *Van Horne*, 823 F.2d at 1287. The entire course of conduct of the debtor is relevant to establish the requisite fraudulent intent. Of import in determining whether the fraudulent intent exists includes the manner in which the debtor attempted to conceal income and assets or their disposition.

The second prong of the inquiry involves a determination, as a matter of law, whether the demonstrated intent constitutes the intent proscribed by the statute. The question is whether the intent is sufficiently abusive to merit denial of discharge. *See Graham*, 111 B.R. at 805.

The Court finds that the debtor used Delta as a vehicle to transfer, counsel and shelter certain assets for the purpose of hindering, delaying and/or defrauding his creditors within the shell of Delta, while retaining the possession, use, and benefits of these assets.[3]

■ (1) The debtor pledged all of the issued and outstanding stock in Delta, the debtor's only asset of value, to E.J. Ball, purportedly for payment of past due attorney's fees and other liabilities. To the extent that the pledge was to secure legal fees owed by other entities, the conveyance was fraudulent as to debtor's creditors. Accordingly, this pledge constitutes an attempt to transfer and conceal assets.

(2) The debtor transferred and concealed funds by depositing checks made payable to him individually or to other entities owned by him into the account of Delta.

(3) The debtor transferred furniture located in a condominium to Delta without consideration within one year preceding the filing of the petition in bankruptcy.

(4) The debtor transferred two Cadillacs and another vehicle to Delta while retaining the vehicles for his own use.

(5) The debtor concealed or offset certain receivables owed by Delta to the debtor and failed to disclose such receivables or offsets.

(6) Delta Title paid and continues to pay personal expenses on behalf of the debtor.

At trial, the debtor and his personal attorney, E.J. Ball, freely and candidly admitted that certain transfers were made, including: (1) the furniture in debtor's 3,000 square foot condominium; (2) three motor vehicles including two "stretch" Cadillacs; (3) deposits of funds including checks in the amounts of $40,000 and $48,000. The furniture and the $40,000 check were owned by the debtor, while other assets were owned by him indirectly as 100% shareholder of Radcliffe Investment Company of Arkansas. Despite the fact that some of the assets were owned by other entities, the

---

**3.** The Court also notes that while Delta pays the debtor's living expenses, the debtor does not declare these funds as income on his tax returns. The debtor was seemingly unaware of any problem, testifying that "Mr. Ball takes care" of such matters. Mr. Ball testified that the funds were charged as a receivable to the debtor to be settled up "sometime." The Court finds that this method of doing business is also indicative of the debtor's fraudulent intent.

debtor treated such assets as his personal property and transferred cash and assets from one entity to another to meet his personal needs.

■ The circumstances of this case indicate debtor's intent to defraud his creditors. Both the debtor and his long-time attorney and friend, E.J. Ball, testified that the transfers of the furniture and cars were book entries without consideration. There was no apparent consideration for the transfer of funds including the $40,000 transfer on May 25, 1988. Debtor's financial condition was in a state of rapid decline and a number of lawsuits had been filed. The transfers were to a closely held controlled corporation, and the stock in the corporation was pledged to debtor's long-time friend and business acquaintances. Kenneth Morrison, the ultimate transferee of the condominium was an old friend for whom the debtor is still doing business. Indeed, the debtor recently received a commission in the amount of $300,000 for selling a farm owned by Mr. Morrison. The debtor retained the use and benefit of all the property transferred. Delta was, in Mr. Ball's words, "the only asset that Mr. Radcliffe had that had any kind of value." The debtor now lives off of Delta and its assets, while the legal interest is purportedly in the hands of congenial friends.

The final fact considered by the Court in determining whether fraudulent intent existed is the demeanor and testimony of the debtor. The debtor's selective memory lapses indicate to the Court that he is not being candid with the Court regarding the transfers. Indeed, when questioned by opposing counsel, debtor was seemingly unaware of very fundamental business transactions. When questioned by his own counsel, he was able to remember, on specific dates, the status of particular transactions. These lapses, juxtaposed with the testimony of other witnesses regarding the debtor's expertise and business acumen fluidly demonstrated by the debtor, indicate to the Court a lack of truthfulness. The Court does not believe the minimal explanations of the transfers put forth by the debtor. The failure to come forward with credible explanations for the transactions, the lack of candidness with the Court, the transfers to close friends, all combined with the fact that the debtor continues to live off the concealed wealth, lead inescapably to the conclusion that debtor's transfers were intended to and in fact did shield those assets from debtor's creditors.

■ The debtor asserts that the transfers were made prior to the one year period stated in sections 727(a)(2)(A). First, the undocumented and unsubstantiated transfer of assets to Delta was made within one year of the filing of the petition in bankruptcy. Accordingly, the elements of section 727(a)(2) are met. Further, under these particular circumstances, the transfer of this property is sufficient of itself to deny discharge.

■ Transfers made more than one year prior to the filing of the petition, however, may also constitute fraudulent transfers within the meaning of section 727(a)(2). It is well-settled that such transfers may provide a basis for denial of discharge if there exists a "continuing concealment." *In re Hodge*, 92 B.R. at 922. "The transfer of title with attendant circumstances indicating that the bankruptcy continues to use the property as his own is sufficient to constitute concealment." *In re Kauffman*, 675 F.2d 127, 128 (7th Cir.1981). *Accord In re Essres*, 122 B.R. 422 (Bankr.D.Colo. 1990); *In re Balch*, 25 B.R. 22 (Bankr.N.D.Texas 1982).

■ A continuing concealment exists in this case. Much of the property transferred constituted personal items of which the debtor retained full use and control, including a very large condominium and luxurious vehicles. The debtor freely admitted he has continued to use and benefit from the assets transferred. He continues to live in the condominium rent free while Delta pays the condominium fees. Debtor continues to use the furniture and automobiles even to the extent of traveling to trial in the Cadillac. Funds of Delta are used to pay virtually all of Debtor's living expenses.

## B. *False Oath: Section 727(a)(4)*

■ Section 727(a)(4), false oath or account, also contains an intent element for denial of discharge. The Court finds that the plaintiffs have met their burden of proof with respect to this section. This section requires the debtor to list all assets and fully answer the questions in the petition, under oath. Omissions from the schedules may qualify as false oath if they are made knowingly and with fraudulent intent. *Graham*, 111 B.R. at 806. The omissions must, however, relate to a material matter. *Chalik v. Moorefield*, 748 F.2d 616 (11th Cir.1984).

■ The debtor signed a voluntary petition, schedules of assets and liabilities, and a statement of financial affairs, all under penalties of perjury. These written declarations have the force and effect of oaths. *In re Sanders*, 128 B.R. 963 (Bankr. W.D.La.1991). The debtor has failed to truthfully report his assets as follows:

(1) On Schedule A–2, the debtor lists his ownership of 100 percent of the stock in Delta as having no value and states that the entity is insolvent. The testimony during trial, however, both by the debtor and Ball, his attorney, was that Delta was the debtor's only asset of value. Delta continues to operate, and pays debtor's living expenses and holds many of the debtor's former assets. The statement that Delta is insolvent is patently and materially false.

(2) On January 1, 1989, the debtor's books and records reflected a receivable due debtor from Delta Title Company of $333,102.54. This receivable has not been paid. This receivable is not listed on the debtor's schedules.

(3) The debtor concealed and failed to schedule certain accounts receivable owed to him from Howard & Craft Farms, a partnership composed of the debtor's sons-in-law. Specifically, on January 1, 1989, Howard & Craft Farms owed the debtor $303,404.92. This receivable has not been paid, nor has there ever been a demand for payment. While the debtor testified that he "made every effort" to collect these sums, he was unable to state what efforts were in fact made. The schedules fail to list this receivable.

(4) The debtor has concealed and wilfully and knowingly failed to schedule his ownership interest in certain personal property, including furniture located at the debtor's residence. At one time, the debtor owned at least forty percent of the furniture located in his 3,000 square foot condominium in Memphis, Tennessee. At trial, the debtor asserted that the furniture was owned in its entirety by Delta, but failed to produce any evidence that the furniture was ever transferred to Delta.

(5) The debtor concealed and failed to schedule cash on hand on the petition date. The debtor admitted to having cash on hand on the petition date. While the debtor testified that funds were a loan from Delta, the debtor failed to list the loan on his schedules.

(6) On July 1, 1989, less than one year prior to the petition date, Debtor owned a condominium located in the Country Club Apartments in Memphis, Tennessee. The condominium contains 3,000 square feet. The debtor's schedules fail to list the condominium and the debtor's statement of financial affairs fails to disclose any disposition or transfer of this asset. Thus, the debtor has either concealed or failed to schedule his beneficial interest in the condominium located in Memphis, Tennessee.

■ This recitation makes it clear that there are a number of material misstatements on the schedules. The issue thus becomes whether these false statements were knowingly and wilfully made. In order for a false statement under oath to serve as a basis for a denial of discharge, the statement must be known by the debtor to be false and be made wilfully with an intent to defraud. This intent can be established by circumstantial evidence. *In re Sanders*, 128 B.R. 963. Moreover, statements made with reckless indifference to the truth are regarded as intentionally false. *Id.*

■ In this case, the evidence leads only to the conclusion that the debtor knowingly and wilfully omitted or falsely

valued assets with intent to defraud. Again, these assets primarily involve Delta. Listing Delta as insolvent allowed the debtor to retain his interest in Delta misleading creditors into believing that the asset was not worth pursuing. In addition, if the indebtedness of Delta to debtor had been properly scheduled, the trustee or creditors would have had the means to get at the assets of Delta prior to Mr. Ball's interest in the stock of Delta. Debtor's entire course of conduct has evidenced a manifest intent to retain the benefits of Delta as well as the assets transferred to Delta. If the debtor had properly listed Delta as solvent as well as the receivable due him from Delta, the benefits retained by debtor would be in serious jeopardy. Debtor's intentions regarding the condominium and the loan to his sons-in-law are likewise transparent. Debtor does not want to be divested of his beneficial interest in the condominium nor does he want the trustee pursuing his family members.

### C. Failure to Keep Records: Section 727(a)(3)

Sections 727(a)(3), failure to keep and preserve recorded information and 727(a)(5), failure to account for assets, do not contain an intent element as part of their proof. The standard is one of reasonableness. *See generally Graham,* 111 B.R. at 806. Under section 727(a)(3), the debtor is required "to take such steps as ordinary fair dealing and common caution dictate to enable the creditors to learn what he did with his estate." *Koufman v. Sheinwald,* 83 F.2d 977 (1st Cir.1936). *Accord Graham,* 111 B.R. at 806; *Anderson v. Wiess (In re Wiess),* 132 B.R. 588, 592 (Bankr.E.D.Ark.1991). Once a plaintiff has made a *prima facie* case, the burden shifts to the debtor to justify why the particular record was not maintained. *Wiess,* 132 B.R. at 592.

In *Wiess,* this Court stated the factors to be analyzed in determining whether discharge should be denied under section 727(a)(3):

These include debtor's education, the sophistication of the debtor, debtor's business experience, the size and complexity of debtor's business, debtor's personal financial structure, and any special circumstances that may exist.

*Wiess,* 132 B.R. at 592. These factors analyzed in the context of the facts in this case indicate that discharge must be denied. The debtor was a major shareholder of several corporations, joint ventures and partnerships. The ventures involved ambitious projects and large sums of money. The debtor's own worth was stated to be in excess of $30,000,000, not long prior to bankruptcy. Witnesses at trial testified to the debtor's apparent business acumen. These factors indicate that there should be large amounts of documentation regarding transactions and persons whose function it was to manage the paper and the transactions. It appears, however, that no one has *any* information regarding either the documents or the transactions. Throughout his testimony, the debtor demonstrated a remarkable memory loss and an implausible lack of knowledge regarding his business affairs. The debtor continually stated, "you'll have to ask Mr. Ball." Mr. Ball, however, did not testify regarding many specifics either.

Thus, the debtor has concealed or failed to keep and preserve recorded business information from which the debtor's financial condition or business transactions could be ascertained. Specifically, debtor failed to keep records from which his business dealings with related entities can be ascertained. Again, the recorded information, which debtor failed to keep, centers upon transactions with insider corporations including Delta. Although debtor's records were reportedly voluminous, debtor failed to keep or preserve records regarding transactions with insiders such as Delta, Radcliffe Investment Company and his sons-in-law. It is noteworthy that lack of documentation primarily exists with respect to the transactions for which there is no consideration, explanation, and with respect to which the debtor managed to retain the benefits, while removing the assets from creditors.

Specifically, the debtor failed to keep records regarding the alleged transfer of furniture to Delta and records underlying

the payments made by Radcliffe Investment Company and Radcliffe Investment Company of Florida which were ultimately deposited in the account of Delta. Indeed, no one was able to testify why the funds were given to the debtor or to Delta. The effect of the failure to keep and preserve records was that, although checks may indicate intercompany transfers, there is no record of why the transfers were made. This is especially important where, as here, the transfers were made by the debtor to the debtor's only solvent entity, Delta, the entity which now meets his rather lavish personal needs. The debtor was unable to produce any records of the (unscheduled) transfers of furniture and condominium.

Finally, with regard to the records of Florida corporations, the testimony of debtor's witnesses at trial was conflicting. Larry Howard testified that E.J. Ball kept all the books and records.[4] In contrast, Mr. Ball testified that those records were maintained in Florida. As a result only copies of checks and vouchers were available at trial. These copies were insufficient to determine the reasons for most, if not all of the intercompany transfers. The debtor had a worth of over thirty million dollars. Today, he purportedly has nothing. He has little, if any explanation as to the disposition of the assets. The failure to provide any specifics regarding a disappearance this large requires denial of the discharge. *See Trinsey*, 114 B.R. 86, 91 (Bankr.E.D.Pa.1990).

### D. Unexplained Loss of Assets: Section 727(a)(5)

■ The debtor has failed to satisfactorily explain the loss or deficiency of assets to meet his liabilities. At trial, the debtor was questioned extensively regarding the loss or deficiency of his assets from his January 1, 1988, financial statement which showed a net worth in excess of $30,000,-000 to a negative net worth one year later. Debtor was unable to explain except to state vaguely that property values declined during that period. Debtor further testified that Mr. Ball would be able to explain what happened to his assets. However, when called upon, Mr. Ball was unable to explain other than to state that the decline in property values led to a number of conveyances to secured creditors. While it may be true that in some circumstances a decrease in property values could eradicate wealth, the debtor must be prepared to demonstrate with specific facts and figures the diminution of the estate. In this case the vague, "real estate values declined" and "I went through a divorce"[5] is grossly insufficient to explain the loss of over thirty million dollars. The failure to provide any specifics regarding this disappearance requires denial of the discharge. *See Trinsey*, 114 B.R. at 91.

ORDERED that the discharge of defendant debtor E.M. Radcliffe is denied.

IT IS SO ORDERED.

---

4. Mr. ⅃ ward also testified that he had to telephone Ball each day to determine the balance in particular accounts of the debtor's ventures. This indicates to the Court that accurate documentation of business dealings occurring in Florida do not exist at all.

5. The divorce occurred many years prior to the loss of $31,000,000.