**In re Robert I. BLANCHARD and Adele G. Blanchard, Debtors.**

**J. Kaj SPENCER and Ellen Spencer, Plaintiffs,**

**v.**

**Robert I. BLANCHARD and Adele G. Blanchard, Defendants.**

**Bankruptcy No. 95–19807DAS.**
**Adversary No. 96–0352DAS.**

United States Bankruptcy Court, E.D. Pennsylvania.

Sept. 23, 1996.

Mark Blank, Jr., Paoli, PA, for Debtors.

Sara A. Austin, Countess Gilbert Andrews, York, PA, for Plaintiffs.

Gloria M. Satriale, Trustee, Chester Springs, PA.

Frederic Baker, Ass't U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

In the instant proceeding ("the Proceeding"), J. KAJ SPENCER and ELLEN SPENCER (respectively "the Husband Plaintiff" and "the Wife Plaintiff," and collectively "the Plaintiffs") contest the grant of a discharge to ROBERT I. BLANCHARD and ADELE G. BLANCHARD (respectively "the Husband Debtor" and "the Wife Debtor," and collectively "the Debtors") on the basis of 11 U.S.C. §§ 727(a)(2), (a)(3) and (a)(4), and the dischargeability of their own particular claims against the Debtors pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), (a)(6). In what we consider to be their three strongest claims, the Plaintiffs allege that (1) the Wife Debtor's interest in the corpus of a testamentary spendthrift trust, and (2) the alleged undervaluation of certain personal property and misstatements of income of the Debtors on their bankruptcy Schedules, justify denial of their discharge; and (3) the sale of assets subject to Plaintiffs' security interest without remitting the proceeds therefrom to the Plaintiffs justifies denial of the discharge of their particular debt.

We find, first, that the sale of assets subject to Plaintiffs' security interest without remitting the proceeds therefrom to the Plaintiffs was not done with the requisite fraudulent intent nor malice. Second, we conclude that the trust in question is not part of the bankruptcy estate; therefore, there is no need to disclose a value of the trust on the Schedules. Third, we find that the Plaintiffs presented little, if any, admissible evidence regarding the value of the personal property which they allege the Debtors undervalued on their Schedules. This being the case, this court finds that the values designated by the Debtors in their Schedules are not proven to be substantially incorrect valuations, noting that all of the property, even assuming the accuracy of the Plaintiffs' valuations, may be exempted. Therefore, the Debtors' discharge will not be denied, nor will this court find that the Debtors' indebtedness to the Plaintiffs is not dischargeable.

## B. FACTUAL AND PROCEDURAL HISTORY

The Debtors filed the underlying joint voluntary Chapter 7 bankruptcy petition on December 15, 1995, along with the requisite Schedules listing their property and its claimed values. On January 18, 1996, after the creditors' meeting of that date, the duly-appointed interim trustee, Gloria Satriale, Esquire ("the Trustee"), filed a Report of No Assets.

The only noteworthy filing in this case, prior to the Proceeding, was the Debtors' motion to avoid the judicial lien of the Plaintiffs on March 15, 1996. The motion was uncontested, and it was granted on April 16, 1996.

The Plaintiffs filed the complaint in the Proceeding in issue ("the Complaint") on March 18, 1996. Pending the initial trial date of the Proceeding of May 14, 1996, the Debtors, on May 9, 1996, filed Amended Schedules which increased the listed value of a piano referenced on the Schedules from $500 to $3,000. After a lengthy continuance of the trial in the Proceeding, and our denial of the Plaintiffs' motion for a further continuance, the trial was held on July 23, 1996. At the conclusion of the trial we issued an order

giving the parties until August 16, 1996 (the Plaintiffs), and August 23, 1996 (the Debtors), to file post-trial briefs.

On August 1, 1996, subsequent to the trial, the Plaintiffs filed a Motion for Declaration of an Asset Case and/or the Removal of Trustee ("the Motion"). The Motion requests our determination that the trust in issue, created by the Wife Debtor's great aunt, Cecilia S. Brill, of which the Wife Debtor is a beneficiary ("the Brill Trust"), is an asset of the Debtors' bankruptcy estate and that the Trustee be obliged to administer the assets of the estate or be replaced. Attached to the Motion are letters sent to the United States Trustee in April 1996 similarly protesting the Trustee's administration of this case as a no-asset case. The Motion appears to have been filed as a response to the court's observations at trial, in response to the Plaintiffs' reference to the April letters, that the Plaintiffs had delayed so long in following up on same that it was probably assumed that the claims had been abandoned, and that administration of the case was about to be completed. The Motion was listed for a hearing on September 17, 1996. After a colloquy at that hearing, the Plaintiffs submitted several authorities to us which allegedly supported their position, referenced at page 126 *infra*.

The factual history underlying the Proceeding begins with an Asset Purchase Agreement dated September 14, 1993, pursuant to which a corporation solely owned by the Debtors purchased two Sylvan Learning Centers ("the Centers"), located in York and Lancaster, Pennsylvania, respectively, from the Plaintiffs. The total amount to be paid for the Centers was $90,000. The Debtors paid $25,000 in cash, and the corporation presented a note and a personal guaranty from the Debtors in favor of the Plaintiffs for the remaining $65,000 of the purchase price, plus interest at a rate of 6.5% per year. In conjunction with the sale, a Security Agreement in favor of the Plaintiffs was executed by the parties. Pursuant to the terms of this Security Agreement, the Debtors gave the Plaintiffs a security interest in the furniture and equipment that was located in the Cen-

ters, and executed UCC–1 financing statements in the Plaintiffs' favor.

The Debtors made payments to the Plaintiffs on the note and guaranty for approximately one and a half years, through April 1, 1995. Having received no further payments, on May 22, 1995, the Plaintiffs confessed judgment against the Debtors in the amount of $60,374.18, with interest, in the Common Pleas Court of York County, Pennsylvania.

Shortly thereafter, in May 1995, the Debtors sold certain of the furniture and equipment that was subject to the Plaintiffs' security interest to a third party for $5,000. The purchaser owned a Sylvan Center in Florida and was contacted by the Debtors about a possible purchase of furniture and equipment only after her name was provided to them by Sylvan's franchise headquarters. None of the proceeds of the sale of the furniture and equipment were turned over to the Plaintiffs. By way of explanation, the Debtors both testified at trial that they did not recall that the Plaintiffs had a security interest in the furniture and equipment. Their counsel, George Zumbano, testified and supported their testimony that he did not recall the taking of the security interest of the Plaintiffs, nor did he mention it to the Debtors as consideration during their disposition of the assets.

The Husband Debtor advised that the Debtors have retained and stored in their garage the remainder of the furniture that was formerly utilized in the two Centers. He noted that the parties have been discussing the return of the furniture as part of a settlement of this matter. We will order that they do so as a condition of this decision favorable to them.

Outside of the issue of the transfer of the furniture and equipment, most of the Plaintiffs' claims centered around alleged inaccuracies in the Debtors' Schedules and Statement of Financial Affairs ("the Statement") filed in connection with this bankruptcy case and the alleged availability of the Wife Debtor's interest in the Brill Trust for distribution to creditors. Specifically, the Plaintiffs noted that the Debtors recited the following financial information on their income tax returns: For the year 1993, Husband Debtor had $0 income, while Wife Debtor had $9,663 wages and $3,687 income from the Brill Trust, for a total of $13,350. In the Statement for that year, the Husband Debtor is designated as having $0 wages/income, while the Wife Debtor recited $7,000 wages and $4,400 income from the Brill Trust, for a total of $11,400. For 1994, the tax returns recited that Husband Debtor had $0 wages/income, while Wife Debtor received $21,800 in wages and $3,946 income from the Brill Trust, totalling $25,746. The Statement indicates that, in 1994, Husband Debtor had $0 income/wages, that Wife Debtor earned $40,-800, and that she received $4,400 in income from the Brill Trust, for a total of $45,200. Finally, for the year 1995, Husband Debtor is designated as having earned $3,525 on the income tax returns and Wife Debtor as having earned $39,050 in wages and received $3,771 income from the Brill Trust, or a total of $46,346. On the Statement for 1995 the Husband Debtor is listed as having earned $4,000 in wages, while Wife Debtor is listed as earning $19,200 per year and $4,400 in income from the Brill Trust. Also, on Schedule I as to that year, the Wife Debtor is designated as receiving $3,400 monthly income, which, when multiplied by 12 months, equals $40,800. Using the $40,800 figure for calculations, the totals for 1995 on the Statement is $49,200. Using the $19,200 figure for calculating the Debtors' income for 1995, the total for that year is $27,600.

The Plaintiffs also take issue with the accuracy of the values claimed for many items of property listed by the Debtors on their Schedules. Specific references are made to the Wife Debtor's full-length mink coat valued at $250, jewelry listed at $250, the Wife Debtor's engagement and wedding rings, not indicated among the jewelry listed, household furnishings valued at a total of $1,680, and a listing of the value of the Wife Debtor's share in the Brill Trust as zero. It was established that the Brill Trust produces about $4,500 annually in income, and distribution of the corpus, of which the Wife Debtor will share about a $\frac{1}{42}$ interest which is expected to exceed $165,000, will occur in March 2002, over six years after the date of the Debtors' bankruptcy filing.

In response to all but the mink coat, the Plaintiffs offered appraisals made by parties who were not present at trial. The offer of these appraisals into evidence was denied. However, the Plaintiffs' brief argues from these appraisals, and their own calculations of the Brill Trust, as if they had been admitted into evidence.[1] As to the mink coat, they did call an expert furrier as a trial witness, but she had not seen the coat and her range of values ($1,000 to $12,000) was accordingly very broad.

## C. DISCUSSION

Several general statements can be made about the Plaintiffs' arguments presented in support of their claims in the Proceeding, none of which lend any favorable inferences to their case. First, there are significant differences between the claims as set forth in their Complaint and the claims as argued in their post-trial brief. Second, the Plaintiffs invoke numerous Code sections as relevant to the same conduct, often evincing a failure to appreciate the different emphases of the various sections referenced. Third, they indicate little ability to distinguish between arguments with no basis whatsoever and those which are at least plausible. The combined effect of the foregoing is a "vague, scattergun approach which rendered the targets less clear than the fact that the Plaintiff's groping for substance verified the lack of same." *In re Ok Cha Nam*, 1993 WL 541135, at *1 (Bankr.E.D.Pa. May 19, 1993), *aff'd,* C.A. No. 94–5439 (E.D.Pa. May 2, 1995), *aff'd,* 77 F.3d 463 (3d Cir.1996).

Furthermore, the Plaintiffs have a distinct tendency to inflate their claims beyond what the record will support. The most egregious example of the foregoing is the attempt to argue from evidence, *e.g.*, the so-called appraisals, which was not part of the record, having been expressly excluded. *See* page 114 n. 1 *supra.* At bottom, such tactics

reflect a lack of confidence in their ability to sustain their cause of action on the record as it actually exists.

In any event, we believe that it can now be said of any and all claims under §§ 727 or 523 that a plaintiff must prove every element of such claims by a preponderance of the evidence. *See Grogan v. Garner,* 498 U.S. 279, 282–89, 111 S.Ct. 654, 656–61, 112 L.Ed.2d 755 (1991) (§ 523(a)(2)(A)); *In re Clayton,* 198 B.R. 878, 882 (Bankr.E.D.Pa. 1996) (§ 523(a)(4)); *In re Segal,* 195 B.R. 325, 331–33 (Bankr.E.D.Pa.1996) (§§ 523(a)(2)(A) and 727(a)(4)); *In re Staffieri,* 1994 WL 463978 at *2 (Bankr.E.D.Pa. Aug. 23, 1994), *aff'd sub nom. Obermayer, Rebmann, Maxwell & Hippel v. Staffieri,* 1995 WL 339019 (E.D.Pa. June 5, 1995) (all § 727(a) claims); *In re Freedman,* 1994 WL 455030 at *3–4 (Bankr.E.D.Pa. Aug. 19, 1994), *aff'd,* 1995 WL 118217 (E.D.Pa. March 9, 1995) (same); *In re Cook,* 146 B.R. 934, 940 (Bankr.E.D.Pa.1992) (same); *In re Henderson,* 134 B.R. 147, 156 (Bankr.E.D.Pa. 1991) (all §§ 523(a) and 727(a) claims); *In re Spector,* 133 B.R. 733, 738 (Bankr.E.D.Pa. 1991) (§ 523(a)(4)); and *In re Goldstein,* 123 B.R. 514, 522 n. 15 (Bankr.E.D.Pa.1991) (§ 727(a)(3)).

### 1. The Plaintiffs' Very Weak § 523(a)(2)(A) Claims Can Be Easily Rejected, Since No Misrepresentations of the Debtors Have Been Proven.

█ In the Complaint the Plaintiffs assert that the debt owed to them by the Debtors is nondischargeable under § 523(a)(2)(A) of the Code because the Debtors falsely represented to them that they had the knowledge and ability to profitably run the Centers; and that the Debtors acted fraudulently because they sold the equipment and furnishings of the Centers that were subject to a security interest held by the Plaintiffs and converted

---

**1.** The impropriety of the Plaintiff's treatment of the appraisals was manifest. Their admission was denied due to the appraisers' failure to appear for cross-examination. *See, e.g., Forward Communications Corp. v. United States,* 608 F.2d 485, 509–11 (Ct.Cl.1979). Clearly, evidence not admitted into the record cannot be considered. *See, e.g., Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v.* *Anderson,* 390 U.S. 414, 440 n. 19, 88 S.Ct. 1157, 1171 n. 19, 20 L.Ed.2d 1 (1968); and *In re Cook,* 146 B.R. 934, 939 (Bankr.E.D.Pa.1992) (involved *pro se* party), and cases cited therein. Allowing such a blatant attempt by counsel to ignore adverse evidentiary rulings to pass would render such rulings immaterial. This conduct is therefore not only improper, but disrespectful.

the proceeds therefrom for their own use. However, in their brief the Plaintiffs do not raise these issues under their § 523(a)(2)(A) claim. Rather, they argue that the Debtors' offending § 523(a)(2)(A) conduct was their failure to notify the Plaintiffs' that the Centers were losing money, which purportedly constituted fraud in their dealings with the Plaintiffs because their silence implied that the Centers were doing well financially.

■ Section 523(a)(2)(A) provides as follows:

(a) A discharge under section 727, ... of this title does not discharge an individual debtor from any debt—

. . . . .

(2) for money, property, services or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; ...

It is well established that, in order to prevail in a claim under § 523(a)(2)(A), the Plaintiff(s) must establish:

(1) that the debtor made the representation;

(2) that at the time the debtor made the representation he knew it was false;

(3) that the debtor made the representation with the intention and purpose of deceiving the creditor;

(4) that the creditor relied on the debtor's representation; and

(5) that the creditor sustained the alleged loss and damages as a proximate result of the representation having been made by the debtor.

*Segal, supra,* 195 B.R. at 331. *Accord, In re Graham,* 194 B.R. 369, 371 (Bankr.E.D.Pa. 1996); *In re Kaplan,* 162 B.R. 684, 701–02 (Bankr.E.D.Pa.1993); *Henderson, supra,* 134 B.R. at 162; and *In re Feldman,* 111 B.R. 481, 485 (Bankr.E.D.Pa.1990).

The Plaintiffs did not introduce any evidence nor elicit any testimony at trial which would lead this court to conclude that the Debtors used false pretenses, made false representations, or acted fraudulently in their

dealings with the Plaintiffs. With respect to the assertions in the Complaint, no evidence whatsoever was introduced concerning the content of any representations by the Debtors regarding their ability to run the Centers prior to the Debtors' purchase of the Centers from the Plaintiffs. In fact, the Husband Plaintiff and the Husband Debtor both admitted that they had never spoken to nor met each other prior to the closing. The Wife Plaintiff and the Wife Debtor were the only two persons who were involved with negotiating the sale of the Centers. The Wife Plaintiff did not attend the trial, and no testimony related to this subject-matter area was adduced from the Wife Debtor. The Debtors did testify that they never told the Plaintiffs that they had any special skill, knowledge, or experience running the Centers.

■ With regard to the Debtors' failure to report the financial difficulties of the Centers, neither evidence of record nor intuition supports the hypothesis that the Debtors had any duty to inform the Plaintiffs that they were having a hard time making a profit running the Centers. There is no authority, and the Plaintiffs cite none, for the conclusion that any such implicit duty arises. Having failed to prove the basic first step of a misrepresentation, the Plaintiffs utterly fail to prove that any such misrepresentations were knowingly false and were meant to deceive the Plaintiffs.

The sale of the Centers' equipment and furniture in derogation of the Plaintiffs' security interest is one of the Plaintiffs' better claims. However, any such claim arises under 11 U.S.C. § 523(a)(6), and is discussed as such, at pages 117–19 *infra*. It is therefore manifestly clear that the Plaintiffs' § 523(a)(2)(A) claims lack substantive justification.

*2. The Plaintiffs' Equally Equivocal and Meritless Claims Under § 523(a)(4) Must Also Be Rejected, As There Is Patently No Express Fiduciary Relationship or Embezzlement at Issue.*

■ The Plaintiffs assert, in the Complaint, that the debt owed to them by the

Debtors is nondischargeable under § 523(a)(4) of the Code because the Debtors breached a fiduciary duty to them by failing to turn over to them the proceeds of the sale of the Centers' equipment and furniture. However, in their brief the Plaintiffs argue only that the Debtors are chargeable with embezzlement because they sold the said equipment in derogation of the Plaintiffs' security interest in same.

Section 523(a)(4), in relevant part, provides:

(a) A discharge under section 727, ... of this title does not discharge an individual debtor from any debt;

. . . . . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny; ...

■ In order to prevail on a claim under the fiduciary duty prong of § 523(a)(4), the Plaintiffs were obliged to prove that the debt in issue arose while the Debtors were acting in a fiduciary capacity as to them. *See, e.g., Clayton, supra,* 198 B.R. at 882, citing *In re Marchiando,* 13 F.3d 1111, 1115 (7th Cir.), *cert. denied sub nom. Illinois Dep't of the Lottery v. Marchiando,* — U.S. ——, 114 S.Ct. 2675, 129 L.Ed.2d 810 (1994); *In re Librandi,* 183 B.R. 379, 384 (M.D.Pa.1995); and *Spector, supra,* 133 B.R. at 738.

■ In cases involving the fiduciary duty prong of § 523(a)(4), this court has further explained that a plaintiff must prove that an express trust relationship existed between the creditor and the debtor in which the latter is the trustee and the former is the beneficiary. *See Clayton, supra,* 198 B.R. at 883; *Kaplan, supra,* 162 B.R. at 704–05; and *Spector, supra,* 133 B.R. at 739. Under Pennsylvania law the elements of an express trust are (1) an express intent to create a trust; (2) an ascertainable res; (3) a sufficiently certain beneficiary; and (4) a trustee who owns and administers the res for the benefit of the beneficiary. *Clayton, supra,* 198 B.R. at 883; and *Kaplan, supra,* 162 B.R. at 705. The Plaintiffs have not undertaken to prove that any of the elements of an express trust characterized the parties' relationship. This claim therefore fails totally,

perhaps explaining its abandonment in the briefing.

■ However, the Plaintiffs have similarly not proven embezzlement, which we have defined as

the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come. It differs from larceny in the fact that the original taking of the property was lawful or with [the] consent of the owner, while in larceny the felonious intent must have existed at the time of the taking. *Spector, supra,* 133 B.R. at 741.

*Clayton, supra,* 198 B.R. at 884. In other words, embezzlement occurs when money or property are transferred to a person who is authorized to receive it but who misappropriates the money or property once it is acquired. *Id.* Thus, in order to prove embezzlement under § 523(a)(4), the creditor must show not only that (1) the debtor appropriated the money or property in question for his or her own benefit, but also that (2) the debtor appropriated the money or property with a fraudulent intent or to deceive. *Id.* at 884–85, quoting *In re Weber,* 892 F.2d 534, 538 (7th Cir.1989).

Without addressing the first of the *Weber* criteria, we note that our discussion of § 523(a)(2)(A) at pages 115–16 *supra* concludes rather easily that the Plaintiffs failed to prove that the Debtors acted with an intent to defraud or deceive them regarding their ability to operate the Centers and in reporting the Centers' financial difficulties. The Debtors testified that, while they did not remit the proceeds of the sale of the furniture and equipment to the Plaintiffs, they did apply the proceeds to their business related expenses and not for their own personal use. As we note in our discussion of § 523(a)(6), at pages 117–19 *infra,* under which this claim is or appropriately asserted, the Debtors have proven to our satisfaction that they sold the furniture and equipment without the prior approval of the Plaintiffs because they did not then recall that there was a security agreement in place on the items. Therefore, each of the Plaintiffs' claims under section 523(a)(4) must fail.

*3. The Plaintiffs' Claims Under § 523(a)(6) Fail Because the Record Does Not Support the Conclusion that the Debtors' Disposition of the Plaintiffs' Collateral in the Equipment and Furniture Was "Willful" or "Malicious."*

In a claim more focused than its previously-discussed claims under §§ 523(a)(2)(A) and (a)(4), the Plaintiffs next assert in the Complaint that the debt owed to them by the Debtors is nondischargeable under § 523(a)(6) because the Debtors converted to their own use the equipment and furniture in the Centers in which the Plaintiffs had a security interest. In their brief the Plaintiffs additionally argue that the Debtors' failure to remit the $5,000 proceeds of the sale of this property to them also constituted conversion. In response the Debtors contend that their selling the equipment and furniture was not done in bad faith, nor was it done in conscious contravention of the Plaintiffs' purported security interest in the property. Therefore, they contend that their actions do not arise to the level of conversion, or of willful and malicious conduct.

Section 523(a)(6) provides:

(a) A discharge under section 727, ... of this title does not discharge an individual debtor from any debt;

. . . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity; ...

■ It is well-established that, for purposes of § 523(a)(6), "willful" conduct is conduct that is deliberate or intentional. *See, e.g., In re Conte,* 33 F.3d 303, 307 (3d Cir. 1994); and *In re Galizia,* 108 B.R. 63, 69 (Bankr.W.D.Pa.1989). Further, "malicious" conduct is conduct that is committed with "conscious disregard of one's duties or without just cause or excuse." *Galizia, supra,* 108 B.R. at 69. Consequently, a debtor's actions will be considered to be "willful and malicious" under § 523(a)(6) only if the debtor's actions are taken with the purpose of producing injury or if they have a substantial certainty of producing injury. *Conte, supra,* 33 F.3d at 307.

■ The mere failure of a debtor to turn over the proceeds obtained from the sale of secured property of a business to a secured creditor does not establish willfulness nor maliciousness. *See In re Cilek,* 115 B.R. 974, 998 (Bankr.W.D.Wis.1990); and *In re Graham,* 7 B.R. 5, 7 (Bankr.D.Nev.1980). This is particularly true when the sale proceeds are used to pay the expenses of the debtor's business. *Cilek, supra,* 115 B.R. at 998–99.

In *Galizia, supra,* an authority cited by the Plaintiffs, the court determined that the debtor willfully injured the creditor because he intentionally disposed of assets in which the creditor had a security interest, and that he maliciously injured the creditor because he knew that the assets were the subjects of the creditor's security interest. 108 B.R. at 69–70.

However, the instant facts are not analogous to those of *Galizia* for several reasons. First, we cannot conclude that the Debtors in this case willfully injured the Plaintiffs, because the Plaintiffs were unable to prove that the Debtors sold the furniture and equipment with the deliberate intention of defrauding the Plaintiffs. Further, the evidence in this case establishes that the Debtors did not maliciously injure the Plaintiffs, since we credit their testimony and that of Attorney Zumbano that they inadvertently forgot that the property in question was subjected to the Plaintiffs' security interest.

The Plaintiffs argue that the tort of conversion has been determined to be a violation of this section of the Code and cite *In re Pasek,* 983 F.2d 1524, 1528 (10th Cir.1993), in support of this contention. In *Pasek* the court stated only that conversion of a creditor's property by a debtor, when done without the creditor's consent or knowledge, intentionally, and without any justification or excuse, which results in an injury to the other creditor, constitutes a willful and malicious injury within the meaning of this exception to dischargeability. *Id.* The Plaintiffs also cite *In re Ramonat,* 82 B.R. 714, 721 (Bankr.E.D.Pa.1988), a decision by Judge Twardowski of this court, for the proposition that a creditor is injured pursuant to § 523(a)(6) if it is precluded from maintain-

ing its rights in collateral by a debtor's actions.

■ There is no question in this case that the Plaintiffs have been prevented from maintaining their rights in the furniture and equipment of the Centers which was sold by the Debtors. However, the *Ramonat* opinion notes that an additional hurdle must be met in a § 523(a)(6) analysis, *i.e.*, the creditor must also prove that the debtors possessed the requisite intent to injure. *Id.* Thus, "[n]ot all conversions create non-dischargeable, 'willful and malicious' injuries." *Id.* Rather, to be nondischargeable the claim must not be " 'founded upon a mere technical conversion, without conscious intent to violate the rights of another, and under mistake or apprehension, . . .' " *Id.*, quoting *In re Behr*, 42 B.R. 922, 925 (Bankr.E.D.Pa.1984), citing in turn *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934). *See also, e.g., In re McLaughlin*, 109 B.R. 14, 18 (Bankr.D.N.H.1989) (not every breach of a contractual obligation is a willful and malicious act).

Here, the Plaintiffs have not proven the requisite intent of the Debtors to injure them. While it is true that the Debtors did convert some items of furniture and equipment in the Centers, we find that they did not do so with the intention of violating the Plaintiffs' security interest therein, since we credit their testimony that they forgot about these interests at the time that they disposed of this property.

We do not agree with Plaintiffs' contention in their brief that "to prove a case under § 523(a)(6), the creditor does not need to prove specific intent to harm by the Debtor," citing *In re Mills*, 111 B.R. 186, 194 (Bankr. N.D.Ind.1988). Rather, we agree with the *Pasek* court's statement that "the test of dischargeability . . . requires proof of deliberate and intentional injury." 983 F.2d at 1527. *Accord, Conte, supra,* 33 F.3d at 307–09.

The Plaintiffs also cite *In re Padgett,* 105 B.R. 665 (Bankr.E.D.Okl.1989), in support of their position that the Debtors in this case acted willfully and maliciously in selling the equipment and furniture in the Centers and thereafter failing to turn over the proceeds

therefrom to the Plaintiffs. However, in *Padgett,* the debtor was a sophisticated and experienced businessman having had more than fifteen years experience in the car sales business who sold vehicles out of trust. In the case at hand, neither one of the Debtors were experienced businesspersons.

We believe that another case decided by Judge Twardowski, *In re Horldt,* 86 B.R. 823 (Bankr.E.D.Pa.1988), is very similar to the case at hand. In that case the debtor sold the personal property that was the subject of the security interest, but did not notify the creditor prior to the sale. *Id.* at 824. The debtor used the proceeds of the sale to pay some of his bills, but he "could not recall" whether he used any of the money to pay the creditor on the loan. *Id.* In that case, Judge Twardowski rejected a § 523(a)(6) claim, distinguishing his decision in *Ramonat. Id.* at 827–28. This conclusion was reached despite the fact that the *Horldt* debtor knew that the property that he sold was collateral for the loan, and hence he acted "willfully." *Id.* at 828. However, the debtor was exonerated because the court found that there was no evidence indicating that he was acting to injure his creditors, and hence that he acted "maliciously." *Id.* at 828.

Similarly, in *In re Long,* 774 F.2d 875, 876 (8th Cir.1985), the debtor, pursuant to an agreement in which security included the proceeds of this business's accounts receivables, was required to keep the proceeds in a separate bank account for the benefit of the creditor. When the business started to suffer, the debtor withdrew over $139,000 from the segregated account and put it into another account, without the creditor's consent, in a futile effort to try to save the business from failing. *Id.* The debtor admitted that he knew that the diversion of funds was in violation of his contract with the creditor. *Id.* at 881. Nevertheless, the court determined that, while the debtor's actions were willful because he knowingly withdrew the funds from the account, they were not done with malice since the money was used to try to save the business. *Id.* at 881–82.

In this case, the Debtors, like the debtors in *Horldt* and *Long*, knew that they had given a security interest in the property in question to their creditors. Like the *Horldt* and *Long* debtors, they applied those funds to the debts of their business. However, unlike both the *Horldt* and *Long* debtors, the Debtors in this case credibly testified they did not recall that the security interest was in place when they diverted funds in violation of same. Accordingly, their actions were not as culpable as those not found in *Horldt* and *Long* to have been proven malicious so as to justify a denial of dischargeability of a debt under § 523(a)(6).

Several other specifics of the circumstances present in the instant facts further support the Debtors' position. The buyer of the furniture and equipment was supplied to them by the national headquarters of Sylvan Learning Centers, which would tend to legitimize the transaction in their minds. We also note that the Plaintiffs reside in York, the situs of one of the Centers. It does not appear that they took any measures to assert their security interests, despite their apparent access to monitoring the Debtors' activities. The Debtors' receipt of only $5,000 for the equipment and furniture, to an unknown third-party, suggests a clearly arm's length transaction in which they received fair market value for property which did not have significant value. Finally, the Debtors' claims of failure to recall the security interest is supported by the testimony of Attorney Zumbano that, given the lack of formality surrounding this modest business transaction, he too did not recall the presence of the Plaintiffs' security interest.

We therefore conclude, with little hesitancy, that the facts of this case do not rise to the level necessary to prevent the dischargeability of the Plaintiffs' claims pursuant to § 523(a)(6). Neither the direct evidence presented nor the circumstantial evidence in this case has proven that the Debtors acted with an intent to injure the Plaintiffs. The explanations provided by the Debtors as to how they sold the furniture and equipment and did not remit the funds to the Plaintiffs are credible and constitute "just cause" for their actions. Consequently, the Plaintiffs have not satisfied their burden of proving that the Debtors acted willfully and maliciously when they sold the furniture and equipment nor when they failed to remit the proceeds of the sale to the Plaintiffs.

*4. Neither the Debtors' Disposition of the Centers' Property Nor the Inaccuracies in Their Schedules Justify Denial of Their Discharge on the Basis of § 727(a)(2).*

The Plaintiffs' claims under § 727(a)(2) reflect a misunderstanding of the nature of this Code subsection and a consequent struggle to identify the specific aspects of the record which are relevant thereto. In the Complaint the Plaintiffs' claims under § 727(a)(2) reference (again) the Debtors' sale of the furniture and equipment of Centers without remitting the proceeds to them, and also the Debtors' failure to list certain items of their personal property and their providing excessively low valuations of certain items of property on their Schedule B. On the other hand, in their brief the Plaintiffs argue that the Debtors' offending courses of conduct under § 727(a)(2) were the discrepancies in their income as listed on their income tax returns and as designated on Schedule I, the transfer of funds from various bank accounts, the omission of certain information from their schedules, low valuation of property on Schedule B, and the fact that no books were kept nor were any financial statements provided with regard to the Brill Trust. Thus, their § 727(a)(2) claims include a touch of the conversion claims more logically referenced under § 523(a)(6), claims of false oaths on Schedules normally associated with § 727(a)(4), and even the failure to keep records of the Brill Trust, referenced later under § 727(a)(3).

Section 727(a)(2) of the Code provides that:

(a) The court shall grant the debtor a discharge, unless—

 · · · · ·

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mu-

tilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition; . . .

At the outset, we observe that all of the sections of § 727(a) must be construed liberally in favor of debtors. *See Rosen v. Bezner,* 996 F.2d 1527, 1531 (3d Cir.1993); and *Segal, supra,* 195 B.R. at 332. In *Rosen, supra,* 996 F.2d at 1531, quoting H.R.REP. No. 595, 95th Cong., 1st Sess. 384 (1977), the court noted that Congress has described the § 727 discharge provisions as " 'the heart of the fresh start of the bankruptcy law provisions of bankruptcy law.' " *See also Staffieri, supra,* 1994 WL 463978, at *2. Thus, a denial of a discharge has been held to be " 'an extreme step . . . not to be taken lightly.' " *Id.,* quoting *Rosen, supra,* 996 F.2d at 1531.

We also note at the outset a significant distinction between the proof required to establish §§ 727(a)(2) and (a)(4) claims as opposed to those raised under §§ 727(a)(3) and (a)(5). The former, §§ 727(a)(2) and (a)(4), require proof of an intent to injure the creditor and knowing and fraudulent action, respectively, while the latter, §§ 727(a)(3) and (a)(5), require no showing at all regarding the debtor's state of mind. *See Cook, supra,* 146 B.R. at 935–36; and *In re Trinsey,* 114 B.R. 86, 90–92 (Bankr.E.D.Pa.1990). As will be noted, except for a rather narrow § 727(a)(3) claim, the Plaintiffs rely almost exclusively on §§ 727(a)(2) and (a)(4), thus requiring that they present evidence of a culpable *mens rea* on the part of the Debtors.

With respect to § 727(a)(2) in particular, the Plaintiffs often stray from the focus of § 727(a)(2), which is directed towards actions of debtors seeking transfer or conceal property from the trustee and creditors. *See In re Cohen,* 142 B.R. 720, 725–30 (Bankr. E.D.Pa.1992); and *Henderson, supra,* 134 B.R. at 156–59. A threshold problem with many of the Plaintiffs' § 727(a)(2) claims is that they do not present a real issue with

regard to the removal, concealment, or transfer of property. The only transfer of property involved here is that of the furniture and equipment of the Centers to the purchaser referred to the Debtors by Sylvan's franchise headquarters. A review of the relevant dates confirms that the Debtors did transfer the furniture and equipment of the Centers within one year of the date of the filing of the bankruptcy petition. However, the Plaintiffs must prove that the Debtors intended to defraud them by their transfer of this property. This they have not done, as we have held under our prior determinations on their section 523(a)(6) claims, at pages 117–19 *supra.*

The Plaintiffs argue that the undervaluations of their property by the Debtors on their Schedules is objectionable under § 727(a)(2). However, this argument is more appropriately raised under § 727(a)(4). Therefore, the objections on this ground are more appropriately considered in our discussion of the Plaintiffs' § 727(a)(4) claims at pages 128–31 *infra.* Similarly, the Plaintiffs' argument that the Debtors' failure to keep books or financial statements in reference to the Wife Debtor's interest in the Brill Trust was objectionable under § 727(a)(2) would be more properly raised under § 727(a)(3). We reference our discussion under that Code section at pages 123–27 *infra.*

The Plaintiffs cite several cases in support of their request for denial of the Debtors' discharge under § 727(a)(2), principally *In re Caparelli,* 131 B.R. 895 (Bankr.S.D.Fla.1991); and *In re Bastrom,* 106 B.R. 223 (Bankr. D.Mont.1989). We will compare the facts of those cases to the instant facts.

In *Bastrom,* the creditor objected to the dischargeability of the debtors' debt to it pursuant to §§ 523(a)(2) and (6), and to the debtors' general discharge pursuant to §§ 727(a)(2) and (4). The relevant facts of the § 727(a)(2) claim were that the parties entered into a loan agreement in which the debtors granted the creditor a security interest in all of their livestock and feed as well as certain certificates of deposit. 106 B.R. at 223–24. The creditor subsequently discover-

ed that some of the livestock which was collateral for the loan was missing. *Id.* at 224. The debtors told the creditor that the livestock was sold and that the sale proceeds had been placed into a commodity trading account. *Id.* The parties then entered into a Memorandum of Understanding wherein the debtors agreed to liquidate their business so that they could repay the loan. *Id.* The debtors also agreed to sell some of their assets and turn the proceeds over to the creditor and to give the creditor a security interest in other assets. *Id.* About a year later, not having liquidated the business entirely, the debtors filed for bankruptcy. *Id.*

Other conduct of the debtors was deemed relevant to the creditor's claim. First, the debtors failed to provide documents to the creditor which were requested through discovery. *Id.* at 226. Also, the Debtors transferred a camping trailer secured by the creditor to their daughter within one year of the filing of bankruptcy and they failed to disclose this on their schedules. *Id.* They also transferred a tractor secured by the creditor within one year of their bankruptcy filing and never disclosed this disposition on their schedules. *Id.*

In *Caparelli* the debtor purchased a business from the creditor in November 1989. 131 B.R. at 896. The creditor financed $40,-000 of the purchase price. *Id.* Pursuant to the sale, the debtor submitted a Financial Information Disclosure to the creditor which listed $207,000 assets and $586 in total liabilities. *Id.* at 896–97. The debtor granted the creditor a security interest in all of the goods, inventory, and accounts of the business to secure the balance of the purchase price. *Id.* at 897. The business was not successful, thus causing the debtor to default on her loan, and the creditor obtained a judgment for the loan balance. *Id.*

After the business failed, the debtor made several transfers of property. She sold the merchandise and inventory of the business, which was the subject of the creditor's security interest, for $8,000. *Id.* Subsequently, the debtor paid off a $40,000 loan from a bank which she had obtained for the benefit of a third party, and she paid off her personal car note in the amount of $17,700. *Id.*

She then took a personal loan from a friend and granted that friend a security interest in her car for the loan. *Id.* Finally, the debtor transferred $10,000 into an annuity which paid her $198 per month. *Id.* She then filed for bankruptcy. *Id.*

The instant case is, in a broad sense, factually similar to *Caparelli* and *Bastrom*. However, the multitude of large, extremely suspicious transfers which were proven in those cases do not exist in this case. Thus, although the instant Debtors herein did sell property in which the Plaintiffs had a security interest, they, unlike the *Caparelli* debtor, applied the proceeds to their business expenses and rather than diverting same to their own personal benefit. Moreover, the Debtors in this case did not transfer any property to family members or friends, as was done in *Bastrom*. There is little question that the debtors in *Bastrom* and *Caparelli* knew exactly what they were doing when they sold and/or transferred the property in those cases and that what they were doing was wrong, particularly since it was clear that they transferred or sold valuable assets to family members or friends in contemplation of filing their bankruptcy petitions. More to the point of § 727(a)(2), the Plaintiffs have not concealed the fruits of the sale transaction. Consequently, neither *Bastrom* nor *Caparelli* support the Plaintiffs' § 727(a)(2) claims in this case.

The remainder of the Plaintiffs' brief referencing § 727(a)(2) is devoted to an analysis of the Debtors' alleged undervaluing of their assets and discrepancies between their tax returns and the declarations of their income set forth in their Statement. No case authority is cited for bringing these contentions within the ambit of § 727(a)(2). There are some allegations regarding withdrawals from accounts and transfers of funds which might fall within § 727(a)(2). However, we believe that these allegations are more appropriately categorized as claims under § 727(a)(4), and we will therefore address them in our discussion of § 727(a)(4) at pages 130–32 *infra*. At this point, we will simply note that the Plaintiffs have made no showing that any of their transfers hindered or delayed the Plaintiffs except the sale of the equipment and furni-

ture of the Centers, and we found no intention to defraud the Plaintiffs in that transfer. Thus, we conclude that no viable claim under § 727(a)(2) has been proven.

5. *The Debtors' Discharge Cannot Be Denied Under § 727(a)(3) on the Basis of their Failure to Produce Records of, or to Include as an Asset of the Estate, the Wife Debtor's Interest in the Brill Trust Because the Brill Trust Is Not Property of the Debtor's Estate.*

In their Complaint the Plaintiffs object to the discharge of the Debtors under § 727(a)(3) of the Code based upon the Debtors' alleged failure to maintain sufficient written information regarding Wife Debtor's interest in the Brill Trust. In their brief, the Plaintiffs modify this argument. Therein, they assert that the objectionable actions of the Debtors under § 727(a)(3) were their omission of the Wife Debtor's interest in the Brill Trust corpus from their list of assets in their Schedules, combined with their contention elsewhere that the Debtors' assets were undervalued, that their Schedules were never amended to show the alleged appraised value of the property, and that no details were given in the Schedules regarding the money withdrawn from the Debtors' retirement account and bank accounts.

Section 727(a)(3) of the Code provides, in relevant part, as follows:

(a) The court shall grant the debtor a discharge, unless

. . . . .

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case; . . .

The leading case regarding maintenance of records in a case involving a section 727(a)(3) claim is *In re Underhill,* 82 F.2d 258 (2d Cir.), *cert. denied sub nom. Underhill v. Lent,* 299 U.S. 546, 57 S.Ct. 9, 81 L.Ed. 402 (1936). *See also Goldstein,*

*supra,* 123 B.R. at 521. The court in *Underhill* opined that there is no requirement to keep books or records in any particular form. 82 F.2d at 259–60. *See also Goldstein, supra,* 123 B.R. at 521. However, when the debtor's business is one in which there are numerous transactions of a complex nature, then the debtor's records must be substantially accurate and complete in order to withstand a § 727(a)(3) challenge to discharge. *Id.* Thus, the records must be in such a state as to allow the creditors, the Trustee, and the court to reconstruct the debtor's financial status. *Id. See also Meridian Bank v. Alten,* 958 F.2d 1226, 1230 (3d Cir. 1992).

In order to prove a claim under § 727(a)(3), a creditor must prove that the debtor did not preserve adequate recorded information. *See Alten, supra,* 958 F.2d at 1232; and *Goldstein, supra,* 123 B.R. at 522. The creditor objecting to a discharge under § 727(a)(3) must prove the following in order to state a prima facie case for discharge: (1) that the debtor did not keep adequate records; and (2) that the debtor's failure to keep adequate records "makes it impossible to ascertain the debtor's financial condition and material business transactions." *Alten, supra,* 958 F.2d at 1232. If the creditor meets these initial burdens, the burden then shifts to the debtor to prove justification for the inadequacy of the records. *Id.* at 1233.

Factors which this court states should be considered in determining whether the debtor's financial records are adequate to overcome an objection to discharge under § 727(a)(3) by a creditor are

whether a debtor was engaged in business and, if so, the complexity and volume of the business; the amount of the debtor's obligations; whether the debtor's failure to keep or preserve books and records was due to the debtor's fault; the debtor's education, business experience and sophistication; the customary business practices for recordkeeping in the debtor's type of business; the degree of accuracy disclosed by the debtor's existing books and records; the extent of any egregious conduct on the

debtor's part; and the debtor's courtroom demeanor.

*Goldstein, supra,* 123 B.R. at 522. Acceptable excuses for failure to maintain sufficient business records are lack of sophistication with regard to business matters, the debtor's subordinate role in the business operation, and that the debtor is an innocent spouse who relied on the other spouse for record-keeping. *Id.* at 523. Consequently, experienced and sophisticated businesspersons are usually held to a high degree of accountability with regard recordkeeping. *Alten, supra,* 958 F.2d at 1231.

■ Except for a brief reference, among their § 727(a)(2) claims, to the Debtors' testimony of their lack of a bookkeeper and their failure to generate financial statements, the Plaintiffs do not appear to make any claims that the Debtors kept inadequate records of their Centers' business. Assuming that their recordkeeping of the Centers' activities might be in issue, we note that it appears that the Centers generated only a modest income or profit. Running such Centers would not normally be considered an unusual or complex task. While the Husband Debtor had business experience and had taken post-graduate business courses, no evidence was presented which would lead this court to consider him to be a sophisticated business-man. Furthermore, no evidence was presented regarding the customary recordkeeping practice in the learning center industry. Accordingly, we find that the Debtors' lapses in recordkeeping in conducting the Center's business, to the extent that they have been proven at all to exist or to be in issue, have not been proven to constitute a viable § 727(a)(3) claim.

The Plaintiffs cite *In re Sofro,* 110 B.R. 989, 991 (Bankr.S.D.Fla.1990), for the proposition that the courts deem the number of assets omitted from the Schedules to be relevant with regard to the determination of whether a debtor's non-disclosures were intentional, particularly if these assets have a substantial value. While this proposition may be true, the court's pronouncements in *Sofro* in this regard related to § 727(a)(2)(A) claims, not § 727(a)(3) claims, the latter of which the *Sofro* court expressly indicates

that it did not address. *Id.* at 992. Therefore, reliance on its holding in a § 727(a)(3) context appears misplaced.

Similarly, the Plaintiffs cite *In re Woodlands Investment Associates,* 95 B.R. 681, 681 (Bankr.W.D.Mo.1988), in their § 727(a)(3) discussion. This case involved a debtor who was a college graduate, longtime businessman, and a member of the board of directors of a bank and a corporation, among other accomplishments. He failed to list an investment retirement account, several bank accounts, a profit sharing account, life insurance policies, and household furnishings on his bankruptcy schedules, the total value of which was $276,296.82. *Id.* at 682. The Debtor defended his actions on the grounds that certain items of the property not listed were not property of the bankruptcy estate because they were entireties property, exempt property, or were transferred to another party prior to the filing of his bankruptcy. *Id.*

The *Woodlands* court determined that the schedules were materially false and justified denial of the debtor's discharge under §§ 727(a)(2) and (a)(4), without reference to § 727(a)(3). Not only are the facts of *Woodlands* clearly distinct from those of the instant case, in that the debtor there failed to disclose a substantial number of assets of significant value, but also the result under §§ 727(a)(2) and (a)(4) supports that the conclusion that the Plaintiffs' analysis of the issue of alleged undervaluation and omission of assets is more appropriately discussed under § 727(a)(4) at pages 127–31 *infra.*

One constant in the Plaintiffs' presentations is their insistence that the status of the Brill Trust be discussed in connection with their challenge to the Debtors' discharge under § 727(a)(3). Although we believe that the Code section reference is misplaced, we will accommodate the Plaintiffs by discussing the connection of the Wife Debtor's interest in the Brill Trust with this bankruptcy case at this time, because it is an issue which deserves discussion at some point.

■ The only pure § 727(a)(3) issue raised in reference to the Brill Trust is that no written documentation was provided to

them regarding it. This argument fails, because adequate and perhaps the only relevant available written documentation regarding the Brill Trust *was* provided to the Plaintiffs in the form of a copy of the will of Cecilia S. Brill and statements from Mellon Bank quantifying the holdings of the Brill Trust. These items were admitted into evidence at the trial of this matter.

The more significant issue regarding the Brill Trust raised by the Plaintiffs is their contention that the Brill Trust is not only a source of considerable income for the Debtors, but also is available for distribution to creditors. The Debtors, meanwhile, contend that they have correctly disclosed the present value of the trust to the Wife Debtor as $0 on their Schedules, since the corpus of that trust is not to be distributed until March 2002. The status of the Brill Trust is also the principal issue raised in the Motion seeking to compel the Trustee to administer this case as an asset case or be removed, referenced at page 112 *supra.*

The principal dispute revolves around the Plaintiffs' assertion that the Wife Debtor's interest in the corpus of the Brill Trust is property of the Debtors' bankruptcy estate. We hold to the contrary, pursuant to 11 U.S.C. § 541(c)(2).

Section 541, provides, in pertinent part, as follows:

(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

. . . . .

(5) Any interest in property that would have been property of the estate if such interest had been an interest of the debtor on the date of the filing of the petition, and that the debtor acquires or becomes entitled to acquire within 180 days after such date—

(A) by bequest, devise, or inheritance;

. . . . .

(c)(1) *Except as provided in paragraph (2) of this subsection,* an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law—

(A) that restricts or conditions transfer of such interest by the debtor;

. . . . .

(2) A restriction on the transfer of a *beneficial interest of the debtor* in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title (emphasis added).

The Brill Trust is a testamentary trust, having been created by the will of Cecilia S. Brill. The will contains a spendthrift clause, relating to the Trust, providing that

[t]he principal of the estate and the net income derived therefrom, so long as the same is held by my Trustees, shall be free from the contracts, liabilities and engagements of any of those beneficially interested therein, and shall not be subject to assignment by them, or to attachment, or execution or sequestration under any legal or equitable process for the enforcement of judgments or claims of any sort against them.

This spendthrift clause seeks to protect the payments of interest income and corpus to the beneficiaries of the trust from being attached, executed upon, or sequestered in any legal or equitable proceeding.

 A spendthrift trust is a trust that limits the ability of the beneficiary to alienate his interest in the trust and limits the creditor's ability to seize the trust property to satisfy its debts. *See Schreiber v. Kellogg,* 50 F.3d 264, 267 (3d Cir.1995); *Wilson v. United States,* 372 F.2d 232, 234 (3d Cir. 1967); *Riverside Trust Co. v. Twitchell,* 342 Pa. 558, 20 A.2d 768 (1941); and *In re Keeler's Estate,* 334 Pa. 225, 229, 3 A.2d 413, 415 (1939).

The Pennsylvania Supreme Court has upheld the validity of the spendthrift trusts

generally, and in fact construes spendthrift provisions broadly. *See Schreiber, supra*, 50 F.3d at 268–70; and *In re Babo*, 81 B.R. 389, 391 (Bankr.W.D.Pa.1988), *reconsideration denied*, 97 B.R. 827 (Bankr.W.D.Pa.1989). Only when a spendthrift trust is contrary to the public policy will Pennsylvania courts not uphold its validity. *In re Mogridge's Estate*, 342 Pa. 308, 311, 20 A.2d 307, 309 (1941). *See also Schreiber, supra*, 50 F.3d at 269; *In re Comp*, 134 B.R. 544, 550 (Bankr.M.D.Pa. 1991); *In re Hysick*, 90 B.R. 770, 774 (Bankr. E.D.Pa.1988); and *Babo, supra*, 81 B.R. at 391. In reaching this conclusion, the Pennsylvania courts have held that a trust that is created only for the benefit of the person who created it, and that vesting a beneficiary with the incidents of ownership, while putting the trusts' assets out of the reach of the beneficiary's creditors, may violate public policy. *Id.*

■ In the bankruptcy context, a determination as to whether a debtor beneficiary is receiving "beneficial incidents of ownership" in a trust is based upon the degree of control that the debtor has over the trust property. *See Comp, supra*, 134 B.R. at 550; and *Hysick, supra*, 90 B.R. at 774–75. Moreover, the measure of the degree of control that the debtor has over the trust is based upon the type of restrictions which the trust itself places on the debtor's access to the trust's funds. *Id.* These factors, however, have been applied only in Pennsylvania cases which involve pension plans, as opposed to traditional spendthrift trusts.

Neither the Plaintiffs nor the Debtors cite any Pennsylvania bankruptcy cases directly on point regarding spendthrift trusts as property of debtors' estates, nor have we found any such cases. For instance, *Schreiber*, though a bankruptcy case, concerned the issue of whether the beneficiary's attorney could assert a lien against the trust for fees on the ground that his services preserved the trust. 50 F.3d at 265–66, 275–78. The only Pennsylvania cases discussing § 541 concern whether pension plans or IRA accounts are exempt from a debtor's bankruptcy estate. *See Comp, supra*, 134 B.R. at 548–53 (stock ownership plan excluded, but profit sharing plan not excluded); *In re Atallah*, 95 B.R.

910, 914 (Bankr.E.D.Pa.1989) (IRA not excluded); *Hysick, supra*, 90 B.R. at 772–74 (pension plan excluded); and *Babo, supra* (pension plan not excluded).

However, the Debtors do cite two analogous cases from other jurisdictions involving spendthrift trusts, both of which are supportive of their analysis. The first of these cases is *In re Newman*, 903 F.2d 1150 (7th Cir. 1990). There, the issues were whether either (1) the debtor's interest in the corpus of a spendthrift trust, due to expire five years after the debtor's case was filed; or (2) the distributions of income for the trust made 180 days following the bankruptcy filing, were property of the debtor's bankruptcy estate. *Id.* at 1151. The trust in issue contained a spendthrift clause which protected the beneficiary's interest in the income and corpus of the trust. *Id.* The court held that the spendthrift clause and the trust language were valid under applicable state law. *Id.* at 1154. Accordingly, the debtor's interest in the trust corpus and the trust monies were held not to be property of the debtor's bankruptcy estate. *Id.* at 1152–54.

In the second case, *In re Kragness*, 58 B.R. 939 (Bankr.D.Or.1986), the trustee and a creditor instituted an adversary proceeding to determine whether, among other things, the debtor's interest in the corpus of two testamentary trusts and income received from the trusts within 180 days after the beneficiary's bankruptcy filing were property of the debtors' bankruptcy estate. *Id.* at 946. The first trust contained a spendthrift clause stating that the trust beneficiary's interest in the trust could not be alienated, conveyed, transferred, or disposed of in advance of payment, nor could any interest in the trust be involuntarily alienated or subjected to attachment or execution, be levied upon, or "taken upon any process for any debts which any beneficiary of this trust estate shall have contracted or shall contract, or in satisfaction of any demands or obligations which any beneficiary shall incur or be liable for. . . ." *Id.* at 941.

The court determined that the spendthrift clause contained in the testator's will was valid under the applicable Hawaiian law. Furthermore, the court determined that 11

U.S.C. § 541(a)(5) makes it very clear that a debtor's interest in a testamentary trust only becomes the property the debtor's bankruptcy estate "if the debtor acquires or becomes entitled to acquire her interest in the trust within 180 days after the date the Chapter 7 petition is filed." *Id.* at 943. Therefore, since the spendthrift clause was valid, the debtor's interest in the corpus of the trust was protected by that spendthrift clause. *Id.* Accordingly, the debtor's interest in the corpus of the trust was held not to be property of the debtor's bankruptcy estate pursuant to 11 U.S.C. § 541(c)(2), even though the trust had terminated prior to the bankruptcy. *Id.* The court did determine, contrary to *Newman,* that the income received from this trust and the other trust was determined to be property of the estate. *Id.* at 944.

We also note *In re Baydush,* 171 B.R. 953, 958 (E.D.Va.1994). In that case, the debtor was the beneficiary of two testamentary spendthrift trusts created by his grandparents. *Id.* at 955–56. The language of the trusts provided that the corpus of the trusts would not be distributed to the debtor until his parents, his aunt, and his uncle died, and all grandchildren living at the time of the testator's death either themselves died or reached the age of 25. *Id.* at 956. At the time of debtor's filing for bankruptcy, neither of the debtor's parents, his aunt, nor his uncle had died. *Id.* Therefore, his interest in the trust corpus was held to be a future interest, *i.e.,* a contingent remainder. *Id.* The court held that the debtor's contingent remainder interests in the corpus of the trusts was subject to the spendthrift provisions of the trusts, and therefore were nontransferable. *Id.* at 956–59. Thus, pursuant to § 541(c)(2), the trusts were not included in the debtor's bankruptcy estate. *Id.* at 958.

In their brief, the Plaintiffs cited only *McGinley v. McGinley,* 388 Pa.Super. 500, 565 A.2d 1220 (1989), in support of their position that the Wife Debtors' interest in the corpus of the Brill Trust is fully vested, and therefore is property of the debtor's estates. However, there was no indication in *McGinley* that the trust in issue was a spendthrift trust, as is the trust in this case. In the case of a spendthrift trust, vesting would not have occurred. Also, *McGinley* is not a bankruptcy case and the issue of trust's inclusion within § 541(c)(2) was not in issue.

Subsequent to the hearing on the Motion referenced at page 112 *supra,* the Plaintiffs produced three additional authorities which allegedly supported their position, *Schreiber, supra; Curtis v. Scott,* 43 F.3d 1466 (4th Cir.1994); and *In re Lonstein,* 950 F.2d 77 (1st Cir.1991). *Schreiber,* as was noted in our discussions at pages 124–25 *supra,* supports the status of the instant trust as a spendthrift trust under Pennsylvania law and does not address the § 541(c)(2) issue. Nor does *Lonstein* discuss that issue, since the contingency that triggered distribution had occurred prior to the bankruptcy filing and distribution had only been delayed. 950 F.2d at 78 & n. 1. In *Curtis* the court found that the trust in issue was not a spendthrift trust. Consequently, all of these authorities can be easily distinguished.

Finally, we note that courts have not been reluctant to extend § 541(c)(2) to exempt trusts which restrict a debtor's right of transfer in other contexts. *See Patterson v. Shumate,* 504 U.S. 753, 757–60, 112 S.Ct. 2242, 2246–48, 119 L.Ed.2d 519 (1992) (ERISA-qualified pension plan falls within § 541(c)(2)). *Cf. Kaplan v. First Options of Chicago,* 189 B.R. 882, 887–91 (1995), *reconsideration denied,* 198 B.R. 91 (E.D.Pa.1996) (pension plan, though not qualified under ERISA, was exempt under Pennsylvania state law).

Therefore, while we can understand the Plaintiffs' frustration that the Wife Debtor will receive a significant sum, estimated to be in excess of $165,000, when the corpus of the Brill Trust is distributed in 2002, and that a determination that the Debtors are not entitled to a discharge, generally or of their particular claim, would preclude an unusually good prospect of actual payment of a debt otherwise discharged, the law does not support their claim that the Wife Debtor's interest in the Brill Trust corpus is property of the Debtors' estate. The response here is that the Code allows the Debtors to obtain a "fresh start" here and now in these circumstances, without regard to their "great expectations" five and a half years from now.

In light of our determination that the Brill Trust is not an asset of the Debtors' estate, we must conclude that the disclosure of the value of the Trust on the Debtors' Schedules is accurate. While a source of income, the Trust is not an asset. We do not understand the Plaintiffs to argue that any of the income from the Trust is non-exempt. *See Newman, supra,* 903 F.2d at 1153–54 (income from spendthrift trust is likewise not property of the debtor's estate). We also would observe that this determination requires that we deny the Plaintiffs' Motion directed at compelling the Trustee to administer the Wife Debtor's interest in the Brill Trust, which we will proceed to do in the attached order. Finally, in light of the fact that the Wife Debtor's interest is not property of the estate, her records and disclosure of that interest is quite adequate under § 727(a)(3), and thoroughly precludes any possible success of the Plaintiffs based on that Code section.

*6. The Debtors' Discharge Will Not Be Denied Under § 727(a)(4) or Any Other Code Section on the Ground That Their Schedules and Statement Are Inaccurate, There Being No Evidence That Any Inaccuracies Therein Were Material or Made Knowingly and Fraudulently.*

 Finally, the Plaintiffs object, in their Complaint, to the Debtors' discharge under § 727(a)(4), based upon the Debtors' alleged failure to provide them with any written information regarding the Brill Trust and because certain items of personal property were allegedly undervalued on Schedule B. In their brief, the Plaintiffs broaden their § 727(a)(4) claim to contend that the Debtors made numerous false oaths and material misstatements in their Schedules and the Statement regarding their income.

Section 727(a)(4) of the Code, in relevant part, provides that:

(a) The court shall grant the debtor a discharge, unless—

. . . . .

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

. . . . .

(D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs; . . .

With regard to Plaintiffs' contention that the Debtors failed to properly list, or to provide them or the trustee with written information regarding the Brill Trust, this issue has already been discussed at pages 123–27 *supra* and rejected. However, throughout their Complaint and brief, although incorrectly referencing §§ 727(a)(2) and (a)(3), the Plaintiffs have raised numerous issues regarding the under-valuation of the assets and other inaccuracies in the Debtors' Schedules and the Statement for consideration, and we will consider that issue here.

 While we are inclined to give some leeway as to the appropriate Code section under which such claims must be raised, we note that, in order to establish a claim under § 727(a)(4)(A), a plaintiff must prove that the debtor (1) made a false oath or statement, (2) that was knowing and fraudulent, (3) which false oath or statement was material to the course of the bankruptcy case at hand. *See Segal, supra,* 195 B.R. at 332; *Henderson, supra,* 134 B.R. at 159–60; and *In re Woerner,* 66 B.R. 964, 971–72 (Bankr.E.D.Pa. 1986), *aff'd,* C.A. No. 86–7324 (E.D.Pa. April 28, 1987). These requirements cannot be avoided by attempting to invoke an inapplicable alternative Code section with less demanding requirements.

This court has previously stated that a false statement or false oath is "material" only if it applies to the discovery of business transactions, assets, past business dealings of the debtor, or the existence or disposition of the property of the debtor's estate. *See Segal, supra,* 195 B.R. at 332. A claim under § 727(a)(2) requires a similar showing of *mens rea, i.e.,* the debtors' intention to hinder a creditor or the trustee must be proven. Only § 727(a)(3), which cannot be invoked to challenge inaccuracies in a debtor's Sched-

ules and Statement, does not include any showing of purposefulness wrongdoing by the debtor. Therefore, we believe that the Plaintiffs are obliged to establish that inaccuracies and omissions in the Debtors' Schedules and Statement were material, knowing, and fraudulent in order to deny the Debtors a discharge on this basis.

At the outset we note a complete failure to prove a necessary element of § 727(a)(4)(D), *i.e.*, that the "officer of the estate," *i.e.*, the Trustee, either requested, or had withheld from her, any recorded information whatsoever.

We can therefore pass on to § 727(a)(4)(A) alone. The Plaintiffs allege that the valuation assigned by the Debtors to their household furnishings, $1,680, is excessively low. They base their position on the appraisal of the items that was done for them by Bruce L. Gilbert ("Gilbert"), who fixed the value of the Debtors' household goods at $13,314 and their jewelry at $1,300. However, Gilbert did not appear at the trial and the appraisal was not admitted into evidence because Gilbert was not available for cross-examination. *See* page 114 & n. 1 *supra*. The record therefore contains no evidence that these items were improperly valued, irrespective of their basis, and, for that reason, this claim cannot be sustained.

 However, it is important to the determination of this and all of the valuation issues raised to ascertain how items of personal property should be valued. We believe that the method of valuation may differ, depending on the liquidating of the property. We also believe that the valuation that a trustee would consider in determining whether to liquidate that property or abandon it to the debtor is the most significant to consider in the context of administration of the debtor's estate.

The Debtors testified that, on the advice of their bankruptcy counsel, they placed a value on the furnishings based upon a tag sale/liquidation valuation. Moreover, the Debtors' counsel admits in their brief that the Debtors assigned the distress sale value to their furnishings.

This issue of the value of an exemption provided for household furnishings, household goods, wearing apparel, appliances, *etc.*, arises under 11 U.S.C. § 522(d)(3). Pursuant to that Code section, a debtor is allowed an exemption of

> [t]he debtor's interest, not to exceed $400 in value in any particular item or $8,000 in aggregate value, in household furnishings, household goods, wearing apparel, appliances, books, animals, crops, or musical instruments that are held primarily for the personal, family, or household use of the debtor or a dependent of the debtor.

The term "value," which is utilized in § 522(d)(3), is defined at 11 U.S.C. § 522(a)(2) as

> fair market value as of the date of the filing of the petition or, with respect to property that becomes property of the estate after such date, as of the date such property becomes property of the estate.

The Debtors' view of valuation of household goods under a distress sale or liquidation value is supported by H. Sommer, CONSUMER BANKRUPTCY LAW AND PRACTICE 103 (4th ed. 1992), wherein it is stated that

> the value given should be in view of the proposed method of liquidation by distress sale, without deduction for liens or exemptions. A good way to convey this concept to clients is to ask them for the "tag sale" or "garage sale" value of specific items. In completing this schedule it is important to bear in mind the very low sale value of most used furniture and appliances.

The case law on this issue of the method of valuation for § 522(d) exceptions generally is rather sparse. This court has only found one case which has held that in a Chapter 7 case the term "fair market value," as used in section 522 to define "value," means the liquidation value of the asset, *In re Walsh*, 5 B.R. 239, 241 (Bankr.D.D.C.1980). Most of the other authority holds that liquidation value is not generally to be utilized in the valuation process for exemptions. *See In re Todd*, 194 B.R. 893, 896 (Bankr.D.Mont.1996) (value applied to debtor's residence was the amount that the debtor would receive from willing and reasonable buyer when debtor was not

under compulsion to sell); *In re Penick*, 170 B.R. 914, 919 (Bankr.W.D.Mich.1994) (fair market value of the debtor's car in redemption was the price based upon a commercially reasonable disposition of the property); *In re Waters*, 122 B.R. 298, 303 (Bankr.W.D.Tex. 1990) (valuation applied to household furnishings in redemption was the value yielded by a commercially reasonable disposition of the property); *In re Mitchell*, 103 B.R. 819, 824–25 (Bankr.W.D.Tex.1989) (generally accepted meaning of fair market value applied to a diamond ring); *In re Windfelder*, 82 B.R. 367, 372 (Bankr.E.D.Pa.1988) (value applied to debtor's residence was the amount that the debtor would receive from willing and reasonable buyer when the debtor was not under compulsion to sell); *In re Henderson*, 33 B.R. 149, 150 (Bankr.D.N.M.1982) (fair market value applied to household furnishings); *In re Cohen*, 13 B.R. 350, 353 (Bankr. E.D.N.Y.1981) (value of residence was the amount that the property would bring if disposed of in a commercially reasonable manner); and *In re Savloff*, 4 B.R. 285, 286–87 (Bankr.E.D.Pa.1980) (valuation applied to residence was the amount that would be obtained from the most commercially reasonable disposition practicable under the circumstances).

The issue of the valuation of household goods is addressed at length in *In re Sumerell*, 194 B.R. 818 (Bankr.E.D.Tenn.1996). There, the debtors valued their household furnishings at $2,135 in their Schedules. *Id.* at 823. Their creditor's expert, who testified at trial, appraised the furnishings at $27,405. *Id.* The Debtors then presented an expert witness of their own who valued the furnishings at $19,850 from a retail standpoint, but at $3,900, or twenty (20%) percent of the fair market value, if they were to be liquidated quickly. *Id.* at 824. The Debtors argued that a further reduced figure of $3,460, based upon a extrapolation of twenty (20%) percent from the purchase prices of the goods in issue, was the most appropriate. *Id.*

The *Sumerell* court discussed the purported split of authority with regard to how exempt property is to be valued under section 522 and concluded that there really is no such split of authority, since only *Walsh*,

*supra*, has held that liquidation value is the proper method of valuation. *Id.* at 825. Therefore, the court held that the appropriate method of valuation is the price that a willing buyer not under a compulsion to sell and a willing buyer not under a compulsion to buy agree upon, " 'after the property has been exposed to the market for a reasonable amount of time.' " *Id.* at 827. It therefore accepted most of the valuation of the creditor's appraiser as to the items he valued. *Id.* at 828–30, 838. Relevant here, in light of our exclusion of the appraisal and the lack of other evidence of value offered by the Plaintiffs, are the court's statements that, in light of the creditors' burden of proving that the exemptions were not properly valued, its objections to items not included in the report of the appraiser-witnesses were denied. *Id.* at 830.

While it is difficult to disagree with the majority of the courts that have addressed the issue that the proper method of valuation with regard to exempt property is generally the price that would be received in a commercially reasonable disposition of the property, we do not agree with the *Sumerell* court's rejection of the concept that the primary purpose of the valuation of property is to determine whether the property is available to a trustee for liquidation. *Id.* at 826. To the contrary, that *is* the purpose of valuation. If a trustee is unable or unwilling to liquidate property, it will inevitably be abandoned to the debtor. *See* 11 U.S.C. §§ 544(a), (b). No purpose would be served by denying a debtor the right to retain property if the trustee is unable to liquidate it for the benefit of creditors.

A particular case in point are household goods. Perhaps the *Sumerell* debtors were a rare exception to the experience that everyday used household furnishings, household goods, clothing, *etc.*, while they are extremely valuable to debtors, are not worth much money on the open market. Therefore, as to such property, a liquidation valuation may well be appropriate. A trustee's auction may bring even less than a tag sale or garage sale. Hence, we are very reluctant to conclude that such a means of valuing household goods is improper. We are certainly unwill-

ing to do so in the absence of testimony from an appraiser subject to cross-examination.

■■■■ One specific item the value of which was raised by the Plaintiffs is the value of a piano owned by the Debtors. We believe that a single valuable piece of household furnishings, as well as jewelry and other liquid assets, in contrast to general household goods, must be valued at fair market value.

The Debtors originally listed the piano in Schedule B with a value of $500. They later amended Schedule B to reflect their own appraisal for the piano, obtained after the Plaintiffs' protests regarding the $500 valuation at the creditors' meeting, in the amount of $3,000. The Plaintiffs did not present any evidence which disputed the $3,000 value of the piano. Thus, it is difficult to see if and how the value of the piano remains at issue except to show that the Debtors were proven to exercise a very conservative tendency in their initial valuations. The piano was nevertheless exempt under 11 U.S.C. § 522(d)(5), as $10,000 of the Debtors' household exemption was "unused." We note that the Plaintiffs, nor any other party, objected to the Debtors' exemptions as claimed.

Also questioned by the Plaintiffs was the valuation of the Wife Debtor of the full-length mink coat, listed on the Debtors' Schedules at $250. While no appraisal was done on the coat, the Plaintiffs presented an expert witness at trial, Susan Eline, who testified that a coat of the description provided at trial by the Wife Debtor was probably worth at least $1,000, and possibly worth as much as $12,000. The facts that Eline indicated such a wide range of values and that she has never seen nor had an opportunity to examine the coat in person render her testimony less than conclusive. We ascertain from this testimony that the Debtors undervalued the coat, but we are unable to say by how much.

Although the mink coat could quite conceivably exceed the $400 limit per an item not owned jointly, the value of the mink coat and the piano taken together are not proven as likely to exceed the $10,000 amount of the Debtors' unused § 522(d)(5) exemption. We are certainly not prepared to find that the Debtors' household goods and wearing apparel exceed the $16,000 aggregate exemption limit for household goods and wearing apparel. See 11 U.S.C. § 522(d)(3). Thus, it is doubtful whether the maximum exemption figure would be reached even in the event that we accepted all of the Plaintiffs' figures.

Also, at issue was the issue of the Debtors' jewelry. The joint jewelry of the Debtors was listed in Schedule B with a combined value of $250. The Plaintiffs purport to refute this valuation based on Gilbert's appraisal of the jewelry at $1,300. However, again, the Plaintiffs cannot rely on Gilbert's appraisal because it was not admitted into evidence. See pages 113–14 & n. 1 supra.

During the hearing, the Plaintiffs' counsel, harking back to the days of trustees who might take such items into possession at creditors' meetings, noted that the Wife Debtor was wearing a one-karat diamond engagement ring and a wedding ring, which she admitted was not among the jewelry listed on Schedule B. However, the value of these rings is unknown, since there is no evidence in the record as to their value. Moreover, with respect to all of the Debtors' jewelry, including the rings, they are each entitled to a $1,000 exemption for same. See 11 U.S.C. § 522(d)(4). There is no evidence that the value of all of the Plaintiffs' jewelry would exceed that amount.

The only other item of property regarding which the Plaintiffs voiced exception was the Brill Trust. That subject was discussed at pages 123–27 supra, wherein we concluded that the Debtors' valuation of the Trust at zero was not inappropriate. We are therefore left with the conclusion that, while the Debtors may have valued the mink coat, their jewelry, and their household goods on the low side, the valuation differential is not material because all of the items would have been eligible for claims of exemption in any event. There is no reason to conclude that such insignificant undervaluation, having no effect on administration of the estate, can be found to have been done knowingly or fraudulently.

■■■■ The Plaintiffs also cited several alleged discrepancies in the Debtors' income as

reported in the Statement and in their federal income tax returns and questioned several of their transfers of funds. The Husband Debtor undertook to explain each of the issues raised. We found his testimony to be credible and that it resolved all of the questions raised.

The Debtors admitted that they closed out a bank account with First Financial Bank in May 1995 containing $40,000. Explaining further, the Husband Debtor testified that the Debtors transferred the $40,000 funds from this account to another account at Main Line Federal Savings and Loan Association. He stated that, since then, the Debtors have been using this money to pay their living expenses. The Husband Debtor also testified that the Debtors closed out a $25,000 certificate of deposit, the proceeds of which they applied to pay their debts.

The Plaintiffs suggested that the Debtors' transfer of funds out of their bank accounts was effectuated with an intent to defraud their creditors. However, the Plaintiffs again have not met their burden of proving such a motivation. In response the Husband Debtor testified that he could not recall exactly when the money was withdrawn from the accounts. However, he also testified that some of the money that the Debtors used to run the Centers between September 1993 and April 1995 was from the proceeds of the $25,000 certificate of deposit, which was purchased with funds received by the Husband Debtor as part of his severance package from his former employer, and from a home equity loan. The Debtors' 1993 and 1994 income tax returns disclose a 1993 distribution from an IRA in the amount of $14,874, and in the amount of $42,598 in 1994. The Husband Debtor testified that the money that the Debtors withdrew from these accounts was utilized for the support of their family and for the business expenses of the Centers. This explanation is completely credible, despite the fact that the Debtors did not produce any written documentation, since the Husband Debtor did not take a salary from his work with the Centers, and he testified that he had no other employment source during the relevant time period. The fact that the Debtors could not remember exactly when they closed out these bank accounts and did not produce any written documentation with regard to their bank account and IRA withdrawals should not, for any reason, affect their ability to obtain a discharge.

Finally, the Plaintiffs point to discrepancies in the income that the Debtors reported in their income tax returns as opposed to what is listed in the Statement. In the context of an objection to a discharge in bankruptcy, a creditor will typically object if the debtor listed less income on the Statement than in income tax returns because this would lend support to an argument that the debtor was trying to prevent a dismissal under 11 U.S.C. § 707(b) by deflating actual income. *See Freedman, supra,* 1994 WL 455030, at *5.

Here, the Plaintiffs are correct in their assertion that there were numerous discrepancies in the amounts designated by the Debtors on their income tax returns as opposed to the figures listed on the Statement, as was set forth in detail at page 113 *supra,* and which we therefore need not repeat at length here. In sum, for 1993 the Debtors designated on their income tax returns a total income of $13,350, while on the Statement the figure totaled $11,400. For 1994, however, the tax returns indicated total income of $25,746, while the Statement showed an income total of $45,200. Finally, for 1995, the Debtors' income tax returns showed a total income of $46,346, and the Statement indicated that the total income was $49,200 if we utilized the $40,800 figure for Wife Debtor's wages in that year, or a total of $27,600 if we utilized the $19,200 figure for her wages from that year. *See* page 113 *supra.* Accordingly, the total amount of income for the years 1993 through 1995 reported on Debtors' income tax returns was $85,442, while it is stated as $105,800 on the Debtors' Statement, assuming a figure of $40,800 for the Wife Debtor's 1995 wages. If we use a 1995 wage figure of $19,200 for the Wife Debtor, the total income designated on the Statement of Financial Affairs is $84,200.

Depending on the 1995 wage figure for the Wife Debtor, the amount of income that is listed on the Statement is either *more* than

the amount of income designated in the Debtors' income tax returns in the aggregate, or very slightly less. The fact that the Debtors put an amount on the Statement which is more than the amount that they actually earned is not materially to the benefit of the Debtors, but is probably slightly to their detriment. These discrepancies therefore appear immaterial, and it is difficult to see how they could have been effected knowingly or fraudulently.

The cases relied upon by the Plaintiffs in their discussion of § 727(a)(4) disclosure issues are *Freedman*, supra; *In re Sanders*, 128 B.R. 963 (Bankr.W.D.La.1991); *Sofro*, *supra; Bastrom, supra, In re Braun*, 98 B.R. 382 (Bankr.N.D.Ill.1989); and *In re Topping*, 84 B.R. 840 (Bankr.M.D.Fla.1988).

We note that in many, if not all, of these cases, the cumulative effect of the inaccuracies and omissions of assets was substantial, and all to the debtors' respective benefits. In *Bastrom*, for example, the total value of the omitted assets was greater than $876,000. 106 B.R. at 227. In *Sanders*, the value of the omitted assets totalled $130,925. 128 B.R. at 928. Furthermore, the *Sanders* debtor had transferred these assets to her children in trust. *Id.* at 927. In addition, the debtor there failed to make any reference to a family-owned corporation on her schedules, nor of its *nine* subsidiaries. *Id.* at 928.

The facts proven in this case do not come close to those presented in *Bastrom* or *Sanders*. The only assets that the Debtors herein failed to list were the Wife Debtor's one-karat diamond engagement ring and wedding ring. The value of these omitted assets is unknown, since the Plaintiffs did not present any evidence of such.

■ The Plaintiffs state, in their brief, that omission of assets from bankruptcy schedules "leads to a deemed reckless indifference or fraudulent intent," citing *Sofro*, *supra;* and *Topping, supra.* A more accurate statement of the law is that the omission of assets from bankruptcy schedules *can* lead to a determination that a debtor acted with reckless indifference or fraudulent intent. Without reciting the facts of *Sofro* and *Topping* in great detail, suffice it to say that the omissions of the debtors in those cases were

much greater than those in the instant case. In *Sofro* the debtors failed to disclose their interest, in three corporations, income received from rental property, three bank accounts, and a loan repayment made by them. 110 B.R. at 991. In *Topping* the debtor omitted from her schedules her ownership of a parcel of real property and neglected to mention that she "gave" her car to her son about six months prior to her bankruptcy filing. 84 B.R. at 841–42.

*Braun, supra,* also involved significant under-valuation of property and failure to disclose assets. In that case, the debtor failed to disclose an interest in a $3,000 certificate of deposit, a $1,000 bank account, 10–15 shares of Kraft Corporation stock, the repayment of a second mortgage in the amount of $18,519 within one year of the filing, the repayment of a car note in the amount of $17,289 within one year of the filing, the repayment of a $10,000 personal loan, and the fact that he owned a one-third interest in a restaurant which was sold for $175,110. 98 B.R. at 384. In addition, the debtor was alleged to have undervalued a parcel of real property by $50,000. *Id.*

Finally, in *Freedman*, this court was confronted with a physician debtor who disclosed his monthly income as less than $5,000 when it was in fact nearly $8,000; omitted reference to rentals totalling $10,000 annually; and grossly understated the funds which he held in bank accounts. *Freedman, supra,* 1994 WL 455030, at *2, *4.

By way of contrast, the cumulative effect of the undervaluation of property and the omissions of property of the instant Debtors was minimal. Such slight errors cannot be found material, nor is there any rational basis on which to conclude that these errors were made willfully or fraudulently, let alone *both* willfully and fraudulently, as is required to prove a case under § 727(a)(4)(A). Based on the foregoing, the Plaintiffs' objections to discharge under § 727(a)(4)(A), or any related claims based on inaccuracies in, and omissions from, the Debtors' Schedules and Statement must be rejected.

## D. CONCLUSION

A order consistent with the foregoing conclusion, rejecting all of the Plaintiffs' claims and denying the Motion, but allowing the Plaintiffs to recover any equipment and furniture from the Centers remaining in the Debtors' possession, will be entered.